SHORNICK, RECEIVER *v*. BUTLER ET AL.

[No. 25,277. Filed March 28, 1933. Rehearing denied June 29, 1933.]

*Montgomery & Montgomery* and *S. A. Barnes,* for appellant.

*Milton B. Hottel, Joseph H. Hottel, Thomas H. Branaman* and *John C. Branaman,* for appellee.

*Hubert Hickam, Alan W. Boyd* and *Robert D. Armstrong, amici curiae.*

FANSLER, J.—In December, 1922, the appellees were directors and stockholders of the Crothersville State Bank, for which the appellant is now receiver. During that month the directors of said bank made an arrange-

ment for the bank by which the appellees became personal sureties for public funds to be deposited with the bank under the public depository law. (§12621, et seq., Burns 1926.)

In consideration of the agreement of appellees to sign the bond as personal surety, it was agreed by the directors for the bank that good and valid notes out of the assets of said bank in the amount of $30,000.00 face value, should be turned over and set aside as a collateral pledge to insure appellees against loss by reason of having signed the bond of the bank as sureties. There was a provision that notes might be substituted from time to time, and that all collections on the notes in question should be held as the property of the appellees for the purpose of the agreement.

A committee selected by the sureties met with the president of the bank, who informed the committee that he was authorized to endorse the notes to be selected by the committee, the notes were selected and endorsed and put in an envelope upon which was written "Notes indemnifying signers of bonds for public funds," and the envelope was placed in the hands of the president of the bank for safe keeping, and so that he might have access to the notes for the purpose of receiving payments of principal and interest.

It was found by the trial court that the bank was "in fact" insolvent at the time this agreement was made. It was, however, still operating. The above agreement was in all things carried out, and public funds were deposited with the bank upon security of the bond.

On September 12, 1923, the state banking department took possession of the assets of the bank, and on the same day The Union State Bank of Crothersville was appointed receiver therefor, and afterwards appellant succeeded it as receiver.

An action was brought against appellees on the bond

in question, and they demanded that the indemnifying notes and the proceeds thereof be turned over to them, which appellant refused to do. This action is to secure possession thereof. .

There were special findings of fact which amount to an elaboration of the above statement, and conclusions of law upon which there was a judgment that appellees should have the pledged paper and the proceeds thereof and that they account to the receiver for any of the proceeds in excess of an amount necessary to reimburse them.

Exceptions to the conclusions of law present the question—may a bank organized under the laws of the State of Indiana pledge its assets, consisting of promissory notes taken and held in the regular course of business, to protect personal sureties on its depository bond?

The appellees were directors and stockholders of the bank, but, since fraud is not alleged and since they received no personal benefit from the transaction, the fact is immaterial.

The appellees were not creditors of the bank and they did not take the assignment of the notes as creditors. The municipality to whom the bond was given was not a creditor of the bank nor would it have become a creditor unless the bond was given. No question of preferring creditors is involved.

Under the depository statute the bank might have pledged eligible bonds directly to the municipality as security for its deposits. The transaction here is no different in effect. The securities were pledged to the appellees, who, in turn, pledged themselves to secure the deposits. In either case the pledged securities were only liable to the extent of the cash actually deposited. The bank parted with an interest in the securities equal to the deposit subject to the condition that, to the extent

to which it repaid the cash, it would reclaim the securities. It amounts to no more than a sale of securities at their actual value for cash. The general creditors of the bank lost nothing by the transaction, and, if they are affected at all, they are benefited since the bank is more liquid by reason of having the cash rather than the securities. The appellees gained nothing. The public deposit or its proceeds was used, or will be used, for the payment of general creditors of the bank. No more than an equal amount of the pledged notes will be withheld.

The action sounds in equity. The general creditors of the bank or the appellant, their representative, can not be heard to say that the pledging of the securities was illegal while they retained the benefits of the transaction. *Melaven* v. *Hunker et al.* (1931), 35 N. M. 408, 299 Pac. 1075.

It would be unconscionable to permit the general creditors to profit where they had no loss, at the expense of the appellees, who have profited nothing and have done no wrong. It must not be permitted unless there is some insuperable rule of law which requires it.

"Justice alone can be considered in a court of chancery, and technicalities never be tolerated except to obtain and not to destroy it." *Isgrigg, Executor* v. *Schooley et al.* (1890), 125 Ind. 94, 25 N. E. 151.

Our banking law gives banks "all the powers incidental and proper, or which may be necessary and usual, in carrying on the business of banking." The right of a bank to borrow money and pledge its assets for the payment thereof is beyond serious question. It is urged, however, that a deposit is not a loan and that banks have no power to pledge their assets to secure deposits. There is no reason for the distinction. In either case the relation of debtor and creditor is created.

It has been expressly held by this court that an agreement to assign collateral as security for a certificate of deposit will be enforced, as in answer to the contention that transaction constituted an ordinary deposit and not a loan, the court said:

> "As to how it should be regarded in this respect, whether as a loan or a deposit, is not material under the facts in this case, for if it be considered as an ordinary deposit its effect would be to create the relation of debtor and creditor between appellee and appellant's bank." *Harris et al.* v. *Randolph County Bank* (1901), 157 Ind. 120, 60 N. E. 1025.

Under this decision, standing unquestioned for more than thirty years, the principle of *stare decisis* might well be invoked were it necessary.

Generally a loan differs from the ordinary deposit in bank only in the evidence of the promise, the time of payment and the interest rate. The relation created is the same. It is a well recognized fact that banks in some instances pay various rates of interest upon ordinary checking accounts as well as upon time deposits against which certificates are issued, payable on demand after a certain date, and that they also on occasion borrow money at varying interest rates upon their promissory notes payable upon a date certain. The basic contractual obligation to pay is the same and, if when the money is received the bank assigns collateral as a guaranty of its repayment, we know no rule or reason which would permit the collateral to be retained in one case and not in another.

The legislature recognized the right of a bank to pledge collateral to secure the payment of ordinary deposits when it enacted the depository law. An examination of the title and body of that act clearly discloses that it was not intended to affect the powers of banks. It merely fixed the terms and conditions upon which public officers may make deposits in banks.

The great weight of recent authority supports our conclusion. *Bliss* v. *Mason* (1931), 121 Neb. 484, 237 N. W. 581.

It is urged that it is bad policy for banks to give security for money deposited; that unless security is given for all deposits unsecured depositors will withdraw their funds and thus destroy the business of the bank. This is a question of business policy with which we are not concerned, but it is well known that banks do pay interest on some types of deposit and not on others.

It is urged that it is against public policy to permit banks to pledge assets to secure the payment of deposits.

Constitutional and statutory enactments, practices of officials and judicial decisions may be looked to for a disclosure of the public policy of a state. Legislative enactments are the safest guides and the fairest in that they operate prospectively and as a guide to future negotiations. Decisions of courts of last resort operate in the same manner after their pronouncement, but in the first instance may have the effect of destroying the contract made before the public policy is announced.

"Without minimizing the importance of the doctrine that contracts should not be enforced if they contravene public policy, many courts have cautioned against recklessness in condemning contracts as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well established rule of law. Other courts have approved the remark of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths.

Considerations such as these have led to the statement that the power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." *Hogston* v. *Bell* (1916), 185 Ind. 536, 544 112 N. E. 883.

We find no constitutional or statutory enactments, no practices of officials or judicial decisions in this state indicating that the pledging of collateral to secure deposits is against public policy. There is nothing inherently wrong or immoral in such a transaction. The only decision of this court upon the subject that we have found upholding such an agreement denies such a policy.

Judgment affirmed.

## ON PETITION FOR REHEARING.

FANSLER, J.—In his petition for rehearing the appellant says that this court acted under a misapprehension of facts in stating that the notes involved were to be turned over and set aside as a collateral pledge, and that all collections on the notes in question should be held as the property of the appellees for the purpose of the agreement.

In his original brief the appellant does not point out any finding of fact which is not supported by the evidence. Nevertheless, we have examined the record and find evidence to support all of the findings. The court found the agreement to be that notes in the amount of $30,000.00 were to be selected from the assets of the bank to be held in trust to secure and indemnify the signers of the bond. The president of the bank was authorized to endorse the notes, and it was agreed that notes might be substituted from time to time with the approval of the committee representing the signers of the bond. Collections would, in fact, therefore, be the property of the trust until, with the

consent of the committee, new notes were substituted, which was the only consideration upon which notes could be removed from the trust. The agreement was carried out according to the finding. The committee representing the signers of the bond met at the bank and selected the notes. The notes selected were then endorsed for said bank by its president, and were put together in an envelope marked, in substance, "Notes indemnifying signers of bonds for public funds," and the notes were then given to Butler, who was president of the bank, to place in the bank for safe keeping and where he could have access to the same in case the obligors desired to pay. The notes continued to be held apart and separate from the notes of the bank, and from time to time notes were substituted and placed in the separate package, with the approval of the committee, and it is found that at all times they were treated as a trust fund set apart for the express purpose of the contract. After the notes were selected by the committee and endorsed and placed in the envelope, it is found that "said notes were then given to said Butler to place the same in said bank for safe keeping and where he could have access to the same." This is sufficient to indicate a delivery to the committee. The notes were endorsed and kept separate from the funds of the bank. It is clear that Butler, although the president of the bank, acted for the committee in holding the envelope with notes for safe keeping in the bank, and that it was contemplated that he, and not the general employees of the bank, should have supervision over the notes for the purposes of the trust. This was a sufficient delivery. *Matthewson* v. *Caldwell* (1898), 59 Kan. 126, 52 Pac. 104; *Buffalo Mfrs., etc., Nat. Bank* v. *Gilman* (1838), 7 Fed. (2d) 94; *In re Cincinnati Iron Store Co.* (1909), 167 Fed. 486.

There was an express finding that the whole transaction was in good faith and that there was no fraud.

It is asserted in the petition for rehearing that the bank at the time the arrangement was made had public funds on deposit which would have been instantly withdrawn unless a bond was filed. Appellant in his original brief does not point out any evidence in the record which establishes that any of the funds secured by the bond were on deposit at the time the bond was given. Such fact does not appear in the findings, nor does the original brief point out a lack of these facts in the findings, but assuming they were true, it follows that a withdrawal of the funds would have affected payment in full to the public and, hence, if the bank was insolvent, would have decreased the percentage that other depositors would have received; and, hence, depositors generally profited since finally the public deposits were paid only in part, and thus the amount available for other depositors is increased.

It must be noted that by signing the bond and becoming responsible for full payment of public funds, and thus procuring those deposits to remain in bank, the signers of the bond, if they knew the bank was insolvent, became personally liable for the difference between the percentage that would be paid to general depositors and the full amount of the public deposits, without any consideration flowing to them, and that the difference in amount remained in the bank for the benefit of general depositors; so that no injury, but, on the contrary, a benefit, resulted to the general depositors at the expense of the signers of the bond, if the condition was such as asserted by the appellant. But the special findings expressly find that the sums deposited were deposited after the signing of the bond and the designation of the bank as a public depository.

It is further asserted in the petition for rehearing:

"The bank being in fact insolvent, it was a criminal act and against public policy to receive public funds or private moneys on deposit; and, appellees do not come into court with clean hands, and can not recover on a contract or transaction made or done in violation of public policy and against positive law."

There is no finding that the signers of the bond knew the bank was insolvent, but if there was such a finding, as we have pointed out above, no creditor was injured by the bank's receiving the deposit. The public funds were protected against loss by the bondsmen at their own expense, and the other depositors were benefited by the deposit remaining in the bank. The depositors may not in conscience complain of a transaction which, even though illegal, benefits them, and seek further benefits at the expense of one who has not profited by the transaction.

It is contended that the contract was made wholly between and among the officers and directors of the bank on one side, without any other person to represent the creditors or depositors and that, therefore, it is void. The contract was made between the bank by its officers, and the signers of the bond as individuals. The bank received the benefit thereof and is bound. It was found to have been made in good faith. The depositors were not injured thereby and can not assert its invalidity.

The acceptance of deposits when the bank was insolvent is illegal, and the officers of the bank who, with knowledge of the insolvency, accepted deposits, are liable. Their liability, however, would not be to depositors who made deposits previous to that time, but only to depositors whose deposits were accepted while the bank was insolvent, and, therefore, an action against such officers so accepting deposits would not lie in favor of the receiver of the bank, but only in favor of the individual depositors affected. The

appellees were not all officers of the bank, and, in the instant case, sued as sureties on the bond and as individuals, and not as representatives of the bank, and since it was found that the transaction was in good faith they stand before the court as though they were not officers or stockholders, but merely accommodation sureties. If the public deposits were received when the bank was insolvent, there can be no complaint since the bondsmen are liable to pay in full and there is no loss. If any of the signers of the bond, while acting as officers of the bank, accepted a deposit from any person knowing that the bank was insolvent, their liability will be to that person whose deposit was accepted. That liability can not be determined in this action, nor can this action be affected by it.

Petition for rehearing denied.

Treanor, J., dissents for reasons stated in opinion dissenting from original opinion.

## DISSENTING OPINION.

TREANOR, C. J., Dissenting.—If we give full effect to the reasoning and holding in *Harris* v. *Randolph County Bank* (1901), 157 Ind. 120, 60 N. E. 1025, the reasoning and result of the majority opinion are correct. It seems that the necessary import of *Harris* v. *Randolph County Bank, supra,* is that a bank may pledge its assets as security for the repayment of deposits and regardless of whether the deposits are made by a public depositor or by a private individual. The aforesaid case also stands for the proposition that insolvency of a bank at the time a deposit is made is immaterial. I agree with the majority opinion that the section of our public depository law authorizing public officials to accept certain types of security for deposits does not in any way increase or decrease the power of banks in the matter of securing deposits and I believe that a bank has no

more power to pledge its assets to secure a public deposit than it has to secure a private deposit. While I am inclined to the view that it is contrary to public policy as expressed in various statutes. regulating the conduct of banks and as determined by experience within the common knowledge for a bank to use its assets to guarantee deposits even when solvent, I have no doubt that it is contrary to such public policy to use its assets, either directly or indirectly, to guarantee deposits at a time when the bank is insolvent. The trial court found as a fact that the Crothersville State Bank was insolvent at the time that the transaction involved in this case took place. In view of the positive prohibitions against the receipt of deposits by banks in state of insolvency it would seem that any contract entered into by officers of a bank for the purpose of obtaining deposits would be invalid. Especially would this seem to be true when, as in the instant case, the directors of the bank, who are charged with the knowledge of insolvency of the bank, entered into a contract with themselves to pledge assets of the bank to indemnify themselves against loss as sureties on a bond to a public depositor for the purpose of inducing the public depositor to make deposits at a time when the bank was insolvent.