**SNEEDEN v. CITY OF MARION, ILL., et al.**

No. 4784.

Circuit Court of Appeals, Seventh Circuit.
April 25, 1933.

Rehearing Denied June 1, 1933.

ALSCHULER, Circuit Judge, dissenting.

Hosea V. Ferrell and John Hay, both of Marion, Ill., for appellant.

Carl Meyer, Richard Mayer, and David F. Rosenthal, all of Chicago, Ill., C. E. Pope and H. F. Driemeyer, both of East St. Louis, Ill., and R. T. Cook, of Herrin, Ill., for appellees.

Leland K. Neeves, of Chicago, Ill. (Scott, MacLeish & Falk, of Chicago, Ill., of counsel), amici curiæ.

Before ALSCHULER and SPARKS, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge (after stating the facts as above).

The questions presented are: (1) Whether the pledge of securities was within the powers of the Bank and therefore valid; and (2) assuming the pledge to be invalid for lack of power, whether the receiver may recover the securities so pledged.

The courts in this country are not in accord as to whether national or state banks may pledge their assets as security for deposits of public or private money. This diversity of opinion has arisen by reason of the difference of state statutes, and a contrariety of economic views in applying the Federal statute and in formulating state policies.

National banks have only such powers as are given by statute. Their general powers which are applicable to the question before us are to be found in the Act of 1864, as amended, clause 7, par. 8, c. 106, 13 Stat. 101; R. S. § 5136, 12 USCA § 24, clause seventh, and are as follows:

"To exercise by its board of directors, or duly authorized officers or agents, subject to law, *all such incidental powers as shall be necessary to carry on the business of banking;* by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; *by receiving deposits;* * * * ." (Our italics.)

Under the amended Act of June 25, 1930, c. 604, 46 Stat. 809, 12 USCA § 90, which relates to depositories of public moneys and financial agents of the Government, it is provided that:

"Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safe-keeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State."

The National Banking Act of 1864 did not expressly give the power to pledge a bank's assets to secure deposits, and if it were thereby granted it was by virtue of an implied power contained in the clause "all such inci-

dental powers as shall be necessary to carry on the business of banking; * ? ^ by receiving deposits; " " * " supra. Since 1864 it seems that Congress has assumed the right of national banks to pledge their assets to secure deposits of certain public funds.[1] Appellant, however, contends that those statutes grant additional powers to national banks relative to the respective funds referred to. This position cannot be maintained because each of the acts, except the one relating to land bank and joint stock land bank deposits, provides for deposits in state as well as in national banks, and of course Congress did not intend to enlarge the powers of state banks. Hence we conclude that in enacting those statutes Congress did not intend to create additional power for national banks in the respect mentioned, but incidentally recognized a power which it thought already existed under a former statute.

Those enactments, however, are not decisive of the question before us, and they are indirectly pertinent only as they may bear upon the intention of Congress in passing the amended Act of June 25, 1930, which grants power to national banks to give the same kind of security for the safe-keeping and prompt payment of deposits of the public money of a state or any political subdivision thereof as is authorized by the law of the state in which such bank is located. The 1930 enactment, therefore, narrows the present controversy to a construction of the law of Illinois relative to the authority, if any, granted by that state to its own banks to secure, by pledge of their assets, public moneys deposited by the treasurer of an Illinois city which is operating under the commission form of government.

The Federal courts have consistently held that the right of priority in the payment of debts due to the government is not an attribute of sovereignty but depends upon the Acts of Congress. United States v. State Bank of North Carolina, 6 Pet. 29, 8 L. Ed. 308; United States v. State of Oklahoma, 261 U. S. 253, 43 S. Ct. 295, 67 L. Ed. 638; Mellon v. Michigan Trust Co., 271 U. S. 236, 46 S. Ct. 511, 70 L. Ed. 924; Liberty Mutual Ins. Co. v. Johnson Shipyards Corp. (C. C. A.) 6 F.(2d) 752; United States v. Middle States Oil Corp. (C. C. A.) 18 F.(2d) 231, 57 A. L. R. 848. We know of no state which has held otherwise, and that principle is not here controverted.

Illinois corporations have only such powers as the laws of that state have given them. Those powers may be either express or implied, and the latter class is limited to those powers which are reasonably necessary to carry out those of the former class. People v. Chicago Gas Trust Co., 130 Ill. 268, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. Rep. 319; Calumet, etc., Dock, Co. v. Conkling, 273 Ill. 318, 112 N. E. 982, L. R. A. 1917B, 814. In this respect banks are no different from any other corporations. If therefore the appellees in the instant case are permitted to prevail it must be on the theory that express statutory power is given by the State of Illinois to pledge assets of the bank as security for deposits; or that such power arises by implication out of the express power granted by the charter to receive deposits. The fact that Federal statutes have impliedly recognized such a procedure in certain instances relative to national banks, does not answer the question now before us, because the only Federal statute here pertinent provides in effect that national banks in Illinois shall not be permitted to guaranty their deposits by a pledge of their assets unless that right is authorized by the law of Illinois in the case of other banking institutions in that State. It must be conceded that Illinois has not expressly granted such right, and if it exists it must be by implication.

Ward v. Johnson, 95 Ill. 215, a case decided in 1880, is relied upon by appellees as holding that such implied right exists in that jurisdiction. In that case the bank had been organized under a special charter which, so far as the record discloses, gave no express power to the bank to pledge assets for the security of deposits. After it had engaged in the general banking business for some time it created an "investment department." This was not done by creating a new corporation or a new agency; it was done by merely giving a new name to a branch of business clearly within the original corporate power. Pursuant thereto it segregated and placed in the hands of a trustee for that purpose, a certain amount of mortgage notes which the bank had received as security from those to whom it had loaned money, and upon which loans the bank was receiving annual interest at the rate of ten per cent. Using this trust fund as a basis, the bank thereupon issued its in-

[1] As to receivership moneys, 39 Stat. 121, 12 USCA § 192; as to making land and joint stock banks depositories, 39 Stat. 365, 12 USCA § 701; as to postal service funds, 39 Stat. 159, 39 USCA § 759; as to depositories of public moneys, 45 Stat. 492, 12 USCA § 332; as to Indian moneys, 36 Stat. 1070, 25 USCA § 156, and 40 Stat. 591, 25 USCA § 162; as to the deposit of moneys received from the sale of United States bonds, 40 Stat. 504, 31 USCA § 771.

vestment certificates upon which it guaranteed annual interest at the rate of 7.3 per cent, payable quarterly. These certificates, after sale or transfer, were exchangeable for other like certificates in the trustee's hands, or they were redeemable in currency, in the order of their presentation, out of the funds in the hands of the trustee, or which might next come to his hands from the collection of the notes and securities pledged for the redemption thereof. The purchasing of these certificates was open alike to all, including the depositors of the bank. Some general depositors of the bank purchased certain of the certificates, for which they paid by transferring a corresponding amount of their general deposits to the investment department. Others purchased certificates of investment who were not then and had never been depositors of the bank. The bank became insolvent, and the question arose whether the securities assigned to the trustee were held primarily for the protection of the certificate holders, or were available for payment of demands of depositors generally. The court held that the pledge was valid and that the securities were held by the trustee primarily for the protection of the certificate holders. That decision has been cited in many other jurisdictions as holding that Illinois state banks may pledge their assets to secure general deposits, but we think that question was neither raised nor decided in the Ward Case. After enumerating the express powers of the corporation, which includes the power to receive money on deposit, the court said (at page 237):

"In addition to these express powers there can be no doubt that such corporations possess, also, the implied power to borrow money. Morse on Banks and Banking, 4; Planters' Bank v. Sharp, 6 How. (U. S.) 323 [12 L. Ed. 447]; Curtis v. Leavitt, 15 N. Y. 52–53; Brice on Ultra Vires, 122 (Seward's Ed. 109).

"It will not, therefore, be important to determine whether the certificate holders, claiming under the trust deed, are to be regarded as having made deposits or loans for which their certificates were obtained, for in the one case [that of receiving deposits] the requisite power is expressly given to the corporation by its charter, and in the other case [that of borrowing money] it possesses the power by necessary implication. Nor can the right of the corporation to assign or mortgage negotiable instruments which it is authorized to take be questioned. McIntire v. Preston, 5 Gilman 48 [48 Am. Dec. 321]; Planters' Bank v. Sharp, supra."

It is quite obvious that in using the first two sentences just quoted the Court was discussing the power of the corporation to receive money either by loan or deposit. The last sentence of the quotation of course refers to the bank's general powers to assign or mortgage negotiable instruments which it is authorized to take, whenever it is necessary and proper as an incident to the conduct of its business. The McIntire Case cited in support of the last proposition was an Illinois decision which merely held that an insurance corporation had the power to take a note and to negotiate it in the transaction of its ordinary business. There was no question presented relative to the preference of policy holders or depositors, and no bank was interested in the controversy. In the Planters' Bank Case which was also cited, the Court held a Mississippi statute which made it unlawful for any bank within that state to transfer by endorsement or otherwise any note, bill receivable, or other evidence of debt, unconstitutional. That case cited as authority the opinion of Chief Justice Marshall in United States v. Robertson, 30 U. S. (5 Pet.) 641, 8 L. Ed. 257, in which case it was assumed without citation of authority that the United States had a right to be secured for a deposit of public funds. In the Robertson Case, the Court and counsel, in construing a bond which pledged the entire assets of the bank to secure the deposits of a customs officer, ignored any question of its possible invalidity, although that question constituted the basis for a very strong dissenting opinion by Mr. Justice Baldwin, in which he called attention to the fact that the point was neither raised by counsel nor noticed in the opinion of the Court. The fact that the right of the United States to be secured for the deposit of public funds was assumed by the court and counsel, was in all probability due to the Act of Congress of March 3, 1797 (chapter 20, § 5, 1 Stat. 515, R. S. § 3466, 31 USCA § 191), then in force, which established priority of the United States in any claims which it might have against insolvent persons or estates.

Up to this point the Ward Case merely premised three elemental propositions upon which it based its conclusions: (1) The bank had express power to receive deposits, (2) it had implied power to borrow money, and (3), as an incident to its business, it had implied general power to assign or mortgage negotiable instruments which it was authorized to take and which it had taken in the general course of its business. The Court then concluded upon the particular facts there pre-

sented that the assets of the bank which had been delivered to the trustee constituted a valid pledge of securities for the payment of the certificates of investment to those holding them; and this it did without expressly stating, otherwise than hereafter mentioned, whether the moneys received from the certificate holders constituted loans or deposits. The Court, however, used the following language (at page 238 of 95 Ill.), "The corporation was authorized to contract and agree with persons desiring to make deposits or loan money as to the terms. It might execute its bond, note or certificate as evidence of the indebtedness, and secure the same by pledge or chattel mortgage, or note, securities, etc., or by real estate mortgage or trust deed, just as should be mutually agreed. And there has been no reason suggested, and we can conceive of none, why providing a system for securing loans and deposits generally in a particular way is objectionable, when it would not be objectionable to conduct a single transaction in that way." This language of the Court is not altogether pertinent to the question presented, for if the money received from certificate holders constituted loans, then the right of the bank to pledge its assets to secure some of its general depositors to the exclusion of others was not before the Court, and in that event whatever the Court said about the right to pledge assets for the security of deposits was beside the question and must be considered as dictum. The mere fact that the Court failed to characterize the moneys thus received either as loans or deposits does not render such language less objectionable if in fact such moneys were loans. That they did constitute loans we think there can be no question, and as such it may be conceded that the bank had a right to pledge its assets for their payment. It is not contended that they were general or trust deposits, and they had very few characteristics, if any, of limited time deposits, for payment of the certificates in currency could be demanded only in the order of their presentation and only from funds in the hands of the trustee, or which might next come to his hands from the collection of the notes and securities pledged for the redemption thereof. The certificates were characterized on their face as investments, and interest thereon was guaranteed by the bank.

Regardless of the Court's statement that it was unnecessary to decide whether the money transactions between the bank and the certificate holders constituted loans or deposits, it is quite obvious that the Court and counsel considered them as loans and so treated them. This fact is quite clearly established by the first sentence of the opinion, "The principal question arising upon this record is, did 'The Merchants, Farmers and Mechanics' Savings Bank' have power to borrow money and issue 'investment certificates' therefor, secured by trust deed, as was here done?" Under those circumstances we are convinced that the moneys paid by the certificate holders for the investment certificates constituted loans to the bank, and were not deposits within the ordinary meaning of that word. Hence, it cannot be said that by the Ward Case Illinois has authorized its banks to pledge their assets as security for the payment of certain general depositors, nor has any other Illinois case been brought to our attention which authorizes such procedure. The question therefore comes to us without helpful precedent from that State.

■ Much has been said by counsel as to the necessity of such procedure and the reasonableness thereof, but it is quite obvious to us that it is neither necessitous nor reasonable. The necessity urged is based upon competition among banks in their ever growing desire to obtain deposits. The employment of such means for that purpose seems to us to be wholly unworthy of, and inconsistent with, the object for which banks are organized, and it is by no means certain from this record that the demand for such procedure is general in its extent, or that it is not actuated by certain depositors rather than by the banks. The apparent necessity arises out of the wrongful practice, and if all banks be prevented from making use of the practice the result will be the same to all. We are not convinced that such prevention will result in a depletion of deposits for any appreciable length of time, for the risk and inconvenience of personally caring for one's own money, especially if the amount is considerable, is greater than most people desire to assume, and it is fair to say that it is only deposits of sizable proportion that are thus sought to be secured. But whatever value may be ascribed to the method as a means of increasing deposits, that value is far outweighed by the evil results which are more than likely to follow. We are convinced that such power is not reasonably necessary to the carrying out of the express statutory powers which have been granted to national banks, or to state banks in Illinois.

■ It is argued that inasmuch as a bank may pledge its bills receivable to secure *loans*, by analogy the power to secure a *deposit* in like manner exists. That argument

is based upon the premise that there is no real difference between a deposit and a loan, and that in either case the relation of debtor and creditor arises. It is true that there are certain characteristics which are common to each, but we think the later and better reasoned opinions hold that there is a vast difference. To define that difference with exactness would indeed be difficult, and for the purposes of this case it is quite unnecessary to do so. It is sufficient to say that the difference has always been recognized by the bankers both in theory and in practice, and their method of bookkeeping and their published reports fail to reveal any basis for an analogy. The United States government and the various states, including Illinois, recognize the difference as shown by the reports which they require to be published. Congress and the various legislatures have recognized the difference over a period of many years by making it a criminal offense for an insolvent bank to receive *deposits*. This has been done obviously for the purpose of protecting depositors; while on the other hand the overwhelming weight of authority is that a bank has the power to borrow money to meet an emergency or an exigency, such as threatened or temporary insolvency. See Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296.

It is well to bear in mind that the business of banking is so intimately connected with the public interest that Congress and the legislatures may prohibit it altogether, or may prescribe the conditions under which it may be carried on. In the exercise of that legislative power there is manifested in all the legislation bearing on American banking a disposition to throw every possible safeguard around the rights and interests of general depositors, and to treat them all fairly, equitably, and impartially. The doctrine of the guaranty of all bank deposits has its advocates and also its opponents, but we have yet to hear of any voluntary public advocacy of guaranteeing a part of the general depositors to the exclusion of others, and securing that guaranty by a pledge of the bank's assets. Legislation looking to that end we apprehend would be quite as unpopular as it would be for a bank publicly to advertise the fact that it was indulging in the practice under the guise of an implied incidental power.

It is said, however, that the general depositor who is not secured is in no wise injured if at the time of the transaction the bank is solvent, because the bank's cash assets are thereby increased by the amount of the deposit. Appellees, however, are not in a position to urge this point, because the value of the securities pledged exceeded the amount of the deposit by several thousands of dollars. To be sure, if the securities pledged retained their value the excess would eventually return to the bank for the benefit of the other depositors; but if they did not retain their value they might never return and the secured depositor would thus participate in a greater proportion of the bank's assets than that to which it would otherwise be entitled. If the value of the pledged assets should fall below the amount of the deposit, the bank, in order to retain the deposit, might be compelled to make additional pledges and thus further deplete the assets to the prejudice of the other depositors.

Another inequitable feature is apparent in case the bank subsequently becomes insolvent, as happened here. In that event if the pledged assets are sufficient to pay the secured deposit, all the expenses of winding up the affairs of the bank are paid out of the unpledged assets and fall upon the unsecured depositors.

A bank's right to pledge its assets as security for some of its general depositors to the exclusion of others has constituted the basis for many legal controversies in this country, and as a result there is a diversity of judicial opinion. That diversity is due not alone to the differences of economic views but also to differences in the statutes involved. In those cases practically every phase of the question has been very ably discussed, and we deem it unnecessary to refer to them except to classify them with relation to the general facts and the statutes there presented.[2] Ap-

[2] Pledge to secure public funds valid by virtue of state statute: Williams v. Hall, 30 Ariz. 581, 249 P. 755 (1926); Williams v. Earhart, 34 Ariz. 565, 273 P. 728 (1929); *Button v. Sanguinetti, 11 P.(2d) 1085 (Ariz. 1932); *Ark.-La. Highway Improvement Dist. v. Taylor, 177 Ark. 440, 6 S.W.(2d) 533 (1928); *McCown v. Edwards, 185 Ark. 620, 48 S.W.(2d) 558 (1932); First Nat. Bank v. Foss, 96 Cal. App. 107, 273 P. 1085 (1928); *Wood v. Imperial Irr. Dist., 17 P.(2d) 128 (Cal. Sup. 1932); *Porter v. Canyon County Fire Ins. Co., 45 Idaho, 522, 263 P. 632 (1928); Schornick v. Butler, 185 N. E. 111, decided by the Supreme Court of Indiana, March 28, 1933. (This decision, however, reverses the decision on the same case originally handed down July 3, 1930, and published in 172 N. E. 181, in which it was held that a statute permitting depositories to pledge certain specified assets in lieu of personal or surety bonds given to secure deposits of public funds did not authorize them to assign or pledge other types of assets to secure the sureties on bonds given to secure the deposits. Since that decision was rendered, the personnel of the Supreme Court of Indiana has changed, and the only member who remains is one who dissented from the original decision.) *City of Louisville

pellees contend that the greater weight of authority upholds the pledge. However, a perusal of those decisions discloses that some are based upon statutes which expressly grant the power, and others upon statutes which contain provisions from which power may rightfully be inferred. Since none of those provisions is present in the Illinois statutes, what appears to be a majority of opinions supporting the pledge, in reality is not such a formidable array of authority on the question presented under the Illinois statutes. Some of the cases referred to deal with deposits of public money, and others deal with individual and corporate deposits other than public money, but we think the same principle applies to each. The power to pledge assets for the security of public money can not, under the decisions of our Supreme Court, be based upon any attribute of sovereignty on the part of the pledgee, but such power must be based upon an express or implied legislative grant. In the absence of an express grant of power, no power by implication should be permitted to prevail unless the facts presented render it reasonably necessary that such implication arise in order fully and fairly to effectuate the express powers granted. We are convinced that that condition does not exist here. Such an implication, viz., that the power to transfer specific

assets to secure a general deposit is an incidental power "necessary to carry on the business of banking," is so inconsistent with equity and good conscience and is fraught with such wrongful possibilities that we are not willing to foist it upon the State of Illinois until its legislature or its courts have spoken clearly to that effect. That those bodies have the right if they choose to approve such policy is not denied, but we merely hold that they have not yet done so.

It is argued that inasmuch as money when deposited as a general deposit becomes immediately the property of the bank, and the relation of debtor and creditor thereupon arises, the bank therefore has an inherent right to deal with those deposits in the conduct of its business as it pleases. Personal and property rights are relative terms, and they can be exercised only so far as they do not conflict with the rights of others. Illinois banks by virtue of their charters have power to do general banking business, which includes the right to receive general deposits. To be sure such a bank owns its assets, and that term includes general deposits, but to say that such bank in the conduct of its business has an unrestricted right to use its assets as it pleases is going further, we think, than the law authorizes. Those who become depositors do so as the result of an express

v. Fidelity & Columbia Trust Co., 245 Ky. 704, 54 S.W.(2d) 40 (1932). But see, also, Comm. Bank & Trust Co. v. Cit. Trust Co., 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950, Ann. Cas. 1915C, 166 (a 1913 Kentucky case decided prior to the 1932 statute and the leading one opposed to the granting of the right to pledge). *Farmers' & Merchants' State Bank v. Consolidated School Dist., 174 Minn. 286, 219 N. W. 163, 65 A. L. R. 1407 (1928); U. S. Fidelity & Guaranty Co. v. Bassfield, 148 Miss. 109, 114 So. 26 (1927); Huntsville Trust Co. v. Noel, 321 Mo. 749, 12 S.W.(2d) 751 (1928); *Bliss v. Pathfinder Irr. Dist., 122 Neb. 203, 240 N. W. 291 (1932); Snider v. Fulton, 44 Ohio App. 238, 184 N. E. 839 (decided by the Court of Appeals of Lucas County, Ohio, Dec. 1932. See, also, Ward v. Fulton, 125 Ohio St. 382, 181 N. E. 815, a case decided by the Supreme Court of Ohio in 1932). *Maryland Casualty Co. v. Board of County Com'rs, 128 Okl. 58, 260 P. 1112 (1926); Mothersead v. U. S. Fidelity & Guaranty Co., 22 F. (2d) 644 (8th C. C. A. Okl. 1927); City of Portland v. State Bank, 107 Or. 267, 214 P. 813 (1923); *Foster v. City of Longview, 26 S.W.(2d) 1059 (Tex. Com. App. 1930); *Austin v. Lamar, 26 S.W.(2d) 1062 (Tex. Com. App. 1930); Pottorff v. El Paso-Hudspeth Counties Road Dist. of Texas, 62 F.(2d) 498 (C. C. A. 5th Circuit, 1933); Pixton v. Perry, 72 Utah, 129, 269 P. 144 (1928); *U. S. Fidelity & Guaranty Co. v. Anderson, 38 Wyo. 88, 264 P. 1030 (1928).

Pledge to secure public funds valid because not prohibited by statute: Richards v. Osceola Bank, 79 Iowa, 707, 45 N. W. 294 (1890); Andrews v. Odebolt Sav. Bank, 203 Iowa, 1335, 214 N. W. 559 (1927); French v. School Dist., 223 Mo. App. 53, 7 S.W.(2d)

*These cases hold variously that while the state involved does have its statute, that statute is to be very strictly construed, and not to be extended beyond its express terms, either as to type of securities to be pledged, or the funds to be protected, etc.

415 (1928); Ainsworth v. Kruger, 80 Mont. 468, 260 P. 1055 (1927); Bliss v. Mason, 121 Neb. 484, 237 N. W. 581 (1931); Melaven v. Hunker, 35 N. M. 408, 299 P. 1075 (1931); Page Trust Co. v. Rose, 192 N. C. 673, 135 S. E. 795 (1926); Richmond County v. Page Trust Co., 195 N. C. 545, 142 S. E. 786 (a 1928 N. C. case holding pledge to secure private deposit also valid); Grigsby v. People's Bank, 158 Tenn. 182, 11 S.W.(2d) 673 (1928). See, also, Citizens' State Bank v. First Nat. Bank, 98 Kan. 109, 157 P. 392, L. R. A. 1917A, 696, a 1916 Kansas case holding that a statute similar to the one construed in Hirning v. Toohey, infra, has reference only to pledge by bank already insolvent, and does not prevent even private pledge by solvent bank.

Pledge to secure public funds valid in accordance with general practice or public policy: First American Bank & Trust Co. v. Palm Beach, 96 Fla. 247, 117 So. 900, 65 A. L. R. 1398 (1928); In re Bank of Spencerport, 143 Misc. 196, 255 N. Y. S. 482 (1932). See also McFerson v. Nat'l Surety Co., 72 Colo. 482, 212 P. 489 (1923), giving no reason for holding such pledge valid; State Bank of Commerce of Brockport v. Stone, 261 N. Y. 175, 184 N. E. 750, a case decided by the New York Court of Appeals, Feb. 28, 1933, holding that while a pledge to secure a private deposit is invalid, the receiver of an insolvent bank must return the amount of the deposit before he is entitled to the return of the pledged securities; and Interstate Nat'l Bank v. Ferguson, 48 Kan. 732, 30 P. 237 (1892).

Pledge of securities invalid: Carter v. Brock, 162 La. 12, 110 So. 71 (1926); Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296 (1926); Hirning v. Toohey, 49 S. D. 496, 207 N. W. 462 (1926); Balt. & Ohio R. Co. v. Smith, 56 F.(2d) 799, a decision by the Circuit Court of Appeals for the Third Circuit holding a pledge to secure a private deposit invalid.

or implied invitation from the bank, and although the bank becomes the owner of the money deposited, it will not, in the absence of legislative authorization, be permitted to use it in such manner as to violate a general depositor's right to be treated fairly, equitably and impartially with all other general depositors.

There is another obstacle which we think defeats appellees' right to prevail in this action. In 1910, Illinois enacted what is known as its Commission Form of Government Act. Smith-Hurd Rev. St. Ill. 1931, c. 24, § 265 et seq., Cahill's Illinois Revised Statutes 1931, c. 24, par. 323 et seq. Section 316 and paragraph 374 deals with the deposit by the city treasurer of the city funds in certain banks. It specifically provides that "any such bank, before any such deposit is made therein, * * * shall * * * execute a good (and) sufficient bond, with sureties to be approved by the president of the said council, and conditioned that such bank will safely keep and account for, and pay over said money. Said president of the council, the commissioner of accounts and finance and the treasurer, in the selection of any such depository bank, shall take into consideration the reputation and solvency thereof, and the sufficiency of the security offered by such bank." That enactment expressly sets forth what an Illinois bank shall be authorized to do in order to secure a deposit of public funds of a city operating under the Illinois commission form of government, and no implication which is not clear will be permitted to strike down that express requirement. If prior to this enactment, as appellees contend, Illinois had committed itself to the policy of permitting assets to be pledged for the security of deposits, that fact would not prevent a change of that policy whenever the lawmaking authorities of Illinois might consider it expedient to make such change, and their reasons for so doing would not be reviewable by the courts.

Even if it be conceded that appellees have properly construed the Court's language in Ward v. Johnson, supra, then we say that section 51 of the Illinois Commission Form of Government Act (Smith-Hurd Rev. St. Ill. 1931, c. 24, § 316, and paragraph 374, c. 24, supra) has superseded the doctrine announced by the Court in that case so far as the facts in the instant case are concerned.

We have refrained from discussing the authorities cited from other courts, because they deal with statutes other than, and different from, the Illinois statutes; or they deal with implied powers which we are convinced do not arise in the instant case, or with economic questions which no doubt were considered by the Illinois Legislature when section 316 and paragraph 374, supra, was enacted, and with which we cannot be judicially concerned.

The question next arises whether section 51 of the Commission Form of Government Act has in any way been modified by subsequent legislation. On June 23, 1919, the "General Banking Act" of Illinois was enacted, and it became effective on December 1, 1920. Smith-Hurd Rev. St. Ill. 1931, c. 16½, Cahill's Illinois Revised Statutes, 1931, c. 16a. In that Act there is no express authority granting banks power to pledge, or prohibiting them from pledging, their assets for the security of deposits; but under the broad general powers therein granted to form banks and banking associations for the purpose of discount and deposit, buying and selling exchange, and doing a general banking business, it is contended by appellees that the same implications as announced in Ward v. Johnson, supra, continue to prevail, inasmuch as the general banking powers granted in the former enactments are not materially different from those contained in the Act of 1919.

Whether a statute has been repealed by implication is a question of legislative intention, and there are acknowledged rules for ascertaining that intention. Such repeals are not favored, and one statute will not be considered as repealing another statute by implication unless the later statute is positively repugnant to the former or is a plain substitute for it. The intent to repeal must very clearly appear. United States v. Claflin, 97 U. S. 546, 24 L. Ed. 1082. Such repeals will not be indulged if there is any other reasonable construction. Peck v. Elliott (C. C. A.) 79 F. 10, 38 L. R. A. 616; Chicago, etc., R. Co. v. Doyle, 258 Ill. 624, 102 N. E. 260, Ann. Cas. 1914B, 385. The presumption against implied repeals has peculiar and special force when the conflicting provisions which are thought to work a repeal are contained in a local or special act and a later and general act. Petri v. Creelman Lumber Co., 199 U. S. 487, 26 S. Ct. 133, 50 L. Ed. 281. The presumption is that the special act is intended to remain in force as an exception to the general act. Rodgers v. United States, 185 U. S. 83, 22 S. Ct. 582, 46 L. Ed. 816; Washington v. Miller, 235 U. S. 422, 35 S. Ct. 119, 59 L. Ed. 295.

Under the circumstances of this case we think there was no intention on the part of the Illinois Legislature to repeal or modify the provisions of section 316 and paragraph 374, supra, by the enactment of the General Banking Act in 1919. The former is a special act and deals with the powers of banks generally. The two are not to be considered as positively repugnant nor offensively inconsistent. It might well be that the Illinois Legislature had good and sufficient reasons for preferring bonds with sureties instead of assets of banks as security for the deposits of cities operating under the commission form of government. This it had a right to do if it so desired, and its reasons therefor cannot be questioned. Subsequent events of which we may fairly take judicial notice may be considered as having somewhat justified that choice.

Appellees urge our consideration of Williams v. Earhart, 34 Ariz. 565, 273 P. 728, 730. In that case the receiver of a bank sued the state treasurer to recover collateral theretofore pledged and delivered by the bank to the treasurer to secure a deposit of public money. The pledge did not consist with the state statute, which provided that a bond with sureties should be given or that a deposit of interest-bearing bonds of the United States should be made with the state treasurer. The state of Arizona was the real beneficiary, and the Court, assuming without deciding that the taking of the pledge was contrary to law, held that the receiver might not repudiate the contract as against the interests of the beneficiary, the State, which was an innocent third party. The Court said: "We agree that security of the kind specified in the statute is the only kind the taking of which would exempt the state treasurer from liability on his official bond in case he deposited state money in a designated depository bank, but it by no means necessarily follows that other security, even though it does not exempt the treasurer from liability for the deposit, cannot be used by him for the protection of the latter." The question before us was not decided by that Court, and the power of a national bank to pledge its assets as security for public funds under a statute similar to the one before us was not in issue. From the quotation above referred to, however, the Court said that the state treasurer still would be liable to the State on his bond because he had not followed the statute, and this means that he would not be released from his bond because he was not authorized by the statute to do the thing that he did. The Court held, however, that the receiver would

not be permitted to repudiate the contract as against the State, an innocent third party. On that phase of the question we do not choose to follow that case, but prefer rather to rely on the reasoning pertinent to that subject in Baltimore & Ohio R. Co. v. Smith (C. C. A.) 56 F.(2d) 799.

Section 316, c. 24, Smith-Hurd Rev. St. Ill. 1931, and paragraph 374, supra, expressly provides that before any Illinois bank may receive a deposit of public funds, of the kind herein described, it shall execute a bond with sureties approved by the president of the city council, as security for the return of the money deposited; and it is not authorized to give, nor is the treasurer authorized to accept, other security. Any other construction would render the statute meaningless. In the present case no bond was given by the Bank, and the assets which were deposited in violation of the statute were neither approved by the president of the council, nor were they deposited with the city treasurer except in escrow and under joint control with the surety on the treasurer's original bond, and by these acts appellees hope to circumvent the express terms of the statute. These things neither the treasurer nor the Bank was authorized to do under the Illinois law and the Federal Act of June 25, 1930, supra.

Our attention has been called to Pottorff v. El Paso-Hudspeth Counties Road Dist. of Texas (C. C. A.) 62 F.(2d) 498. In that case the appellee was organized under a special Act, which among other things, provided that the Treasurer or depository should be governed by the same laws as are provided for depositories of county funds; provided that before any such treasurer or depository should be entitled to receive any funds of the district, it should give bond to the district in amount equal to the funds deposited. Article 517a Vernon's Ann. Civ. St. Tex., relating to depositories of county funds, provided that no bank, or bank and trust company, except where specifically authorized by statute or except in the case of a deposit of public funds, should give preference to any depositor by pledging the assets of the corporation as collateral security. Instead of giving a bond to protect appellee's deposit, part of the bank's assets were pledged. Appellee contended that the statutes should be construed together and that with such construction the pledge was authorized and valid. This contention was sustained and the Court further said that aside from article 517a, ample authority was to be found in the other statutes relied upon, and in the general law. The

other statutes referred to were not cited. It will be remembered that the Illinois statutes contain nothing resembling the provisions relied upon in this case.

It may be urged that the equities surrounding the transaction should appeal even to a court of law in arriving at its conclusions on the ground that the pledge was made in good faith and with the approval of the board of directors; but it should also be remembered that the pledge in all probability was made in the absence of and without the knowledge of the unsecured depositors. It is quite obvious that the surety on the treasurer's bond is the moving spirit in this controversy, and it has a perfect right to be. It should neither be criticised nor penalized on account of that fact, but in speaking of equities it should be borne in mind that it voluntarily entered into the contract for which we assume that it received a cash consideration. It voluntarily assumed the risk of accepting a pledge of the assets of an Illinois bank, notwithstanding the fact that that State had granted neither express nor implied power to its banks to make such pledge. Under those conditions we think the surety is in no position to complain.

■ Appellees' contention that the receiver is without authority to maintain this action is without merit. Baltimore & O. R. Co. v. Smith, supra; Wood v. Imperial Irr. Dist. (Cal. Sup.) 17 P. (2d) 128; Austin v. Lamar (Tex. Com. App.) 26 S.W.(2d) 1062. The receiver represents more than the insolvent institution. He also represents all the creditors of that insolvent institution. Davis v. Gray, 83 U. S. (16 Wall.) 216, 21 L. Ed. 447; Franklin Nat'l Bank v. Whitehead, 149 Ind. 560, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. Rep. 302. It is true that ordinarily when two parties have entered into a contract which has been fully executed on both sides, one will not be allowed to set up the defense of ultra vires without making some sort of restitution. However, in such a case as has arisen here, there are other parties to be considered in addition to the two contracting parties, namely, the general depositors whose rights have been infringed by the action of the two contracting parties. Restitution would simply continue that wrong against innocent parties. Further, as was stated in Balt. & O. R. Co. v. Smith, and in Wood v. Imp. Irr. Dist., supra, there were two acts involved in the transaction under consideration, one, the deposit which was perfectly valid, and the other, the pledge which was invalid. It does not appear to us as worthy of judicial approval

that the secured depositor may take advantage of the ultra vires act of the bank and assert an estoppel grounded upon such act. It had no right in making the deposit to rely upon a preference in the form of an unlawful transfer of assets. Otherwise both parties, bound to realize the illegality of the transfer, might, in the face of such unlawfulness, agree to make the transfer, saying each to the other, "though the transfer is not authorized by law, yet we will make it and accomplish the desired result despite its illegality, for neither may hereafter rescind without restoring the original status." We do not approve of the accomplishment of an illegal result by way of any such unconscionable use of the doctrine of estoppel. We hold with the decisions in the cases cited that the receiver may repudiate the invalid pledge without returning the valid deposit, and that appellees must share with the other general depositors in the distribution of the Bank's assets.

The judgment of the District Court is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

ALSCHULER, Circuit Judge (dissenting).

I do not concur in the holding that there is in Illinois a public policy against permitting banks to pledge assets for securing public deposits unless authorized by a statute. I believe that Ward v. Johnson, 95 Ill. 215, sufficiently indicates the view of the Supreme Court that public policy in Illinois is not opposed to such pledges. The case has been quite frequently cited in other jurisdictions to support the proposition that in Illinois such pledge of assets is not contrary to the state's public policy.

The recent case of People ex rel. Nelson v. Peoples State Bank of Maywood, 266 Ill. App. 330, while not in all respects like that at bar, in my judgment recognizes the binding force of such a pledge; and the reviewing decision of the Supreme Court of Illinois, in an opinion filed October 22, 1932, —— N. E. ——, does not conflict therewith. However, upon the petition of both parties a rehearing has been granted, which at present writing is pending.

It is significant that in a state so commercially important as Illinois, where presumably there have been many such transactions not falling within the provisions of any statute, such pledges, if deemed contrary to the

state's public policy, have not long since been denounced by its courts.

It is pointed out, in support of such a public policy of the state, that ordinarily there is secrecy in such pledges of which the general public has no notice, and that depositors not so secured would usually have no means of knowing how much of the bank's reported assets are so segregated.

It seems to me that the vice is not with the pledging of the assets, but with the laws and regulations concerning reports and advertisements of banks. I fully agree that banks should be required to make frequent public reports of their condition, and that in such reports it should be specifically disclosed what part of the reported assets is so pledged. To my mind it is a vicious practice to permit banks to advertise their "resources" at an amount inclusive of their total deposits, without requiring that at the same time, and quite as prominently, there be stated the liabilities to which the resources are subject.

It is also pointed out that such pledging of a bank's assets may, in case of the bank's threatened disaster, enable certain depositors to be favored as against others. This, of course, would bring into the picture collusion and probably fraud, which would be dealt with when it appears, but which is not involved here, where concededly there was no suggestion of circumvention or favoritism, and where, at the time of the pledge, the bank was solvent.

But if it may be said that the policy of the state, or even of the United States, is against such pledges, and that the giving of them was ultra vires the bank, another proposition arises which in my judgment would in any event require restoration of the deposits, made in good faith upon the ultimate security of the bank's pledge, before the bank or its representative may be permitted to take back the securities. The case of State Bank, etc., v. Stone, 261 N. Y. 175, 184 N. E. 750, decided by the New York Court of Appeals February 28, 1933, specifically so decides. In that case it is held that, while the bank was without power to pledge assets to secure a "private deposit," the receiver of the insolvent pledgor bank must pay back the amount of the deposit before he is entitled to a return of the pledged securities. In the case at bar it was the good faith deposit of the bank's securities that enabled the city's treasurer to procure a bond to protect the city against loss through any such deposit; and the bank or its receiver should not be permitted to withdraw the securities without making whole the depositor who, upon the faith of the pledge, deposited the funds in the bank. The bank itself could not properly urge its want of power to make the pledge, in support of its undertaking to recall the pledge, without first making good the deposit; and, as fully reasoned in the New York case, the rights of the receiver are not in this regard different from those of the bank itself if there were no receiver.

It is said that this rule would not apply because there is another party to the transaction, namely, the unsecured depositors and creditors of the bank. As to this contention the New York case is like this one, both having as the "third party" the unsecured depositors and creditors. Without further elaboration thereon I refer to that case and its discussion of the proposition.

In this connection I think it should be considered that in a pledge such as this one the bank's assets are not depleted. The deposit of the public funds made on the strength of the pledged assets becomes the property of the bank and gives to the bank, in additional cash assets, the substantial equivalent of the securities pledged.

But the opinion is further based on the conclusion that by the Illinois Commission Form of Government Act the city and its treasurer are disqualified from depositing, and the bank from receiving, deposit of city funds on any other terms than as the act prescribes, and the subsequent act of Congress referring to state laws specifies. This first act specifies that the city treasurer shall make daily deposits of receipts from all sources of revenue in one or more banks *situated in the city*, to be selected by the president of the council, the commissioner of accounts and the treasurer, or by any two of them, and that before deposit is made therein the bank shall be required to enter into an obligation with the said council to pay interest on deposits at a rate of not less than three per cent per annum, and shall execute bond, with sureties approved by the president of the council, conditioned that the bank will safely keep and account for said money.

These provisions prescribe the duties and direct the conduct of the treasurer and other city officers in the matter of depositing money, but in my judgment they are in no sense or degree a limitation upon the right of a bank to pledge its assets as security for deposits. If in making the deposit the treasurer does not comply with the statute, he may remain personally liable to the municipality for the safety of the deposit, but the act does

not deny to banks the right further to secure the depositing municipality or its treasurer or his sureties, by pledge of assets, even though all the statutory requirements have been observed.

It is to be noted that only comparatively few Illinois municipalities are under the Commission Form act, and that the policy in Illinois of permitting the pledging of a bank's assets as security for deposit of public funds continues to be applicable to those municipalities unaffected by the Commission Form act. I cannot conceive that by the Commission Form act it was intended to distinguish between the two classes of municipalities as to the right of banks to pledge their assets to make secure deposits of municipal funds. The act was in regulation of cities, not banks.

I am well satisfied that the general right of an Illinois bank to pledge its assets to secure deposits of public funds was not withdrawn by the Commission Form act, and that Illinois banks had and have the right to pledge their assets to secure deposits of municipalities under Commission Form of government, as well as of other municipalities.

But in the case of the city of Marion it is particularly to be noted that at this time there were no banks whatever in the city, and it was impossible to comply with the statutory mandate of selecting a bank of that city in which to deposit the city's funds. What then was to be done? Must the city and its treasurer assume the risk of thieves and fire and other perils by keeping the funds in physical possession for lack of express statutory authority to select a depositary elsewhere? In the opinion of October 22, 1932, in People ex rel. Nelson v. Peoples State Bank of Maywood, supra, it is said: "There was no necessity for a law or an ordinance authorizing the village treasurer to deposit the funds in his hands in a bank. That was customarily done. * * * We know of no case in this State in which the legality of the deposit of public funds by their custodian in a bank has been questioned. The reason, no doubt, is, that the practice has been universal and has been recognized as necessary." The situation was one which evidently the statute did not contemplate, and to my mind the statute did not cover such a contingency and is therefore not applicable to this case. If the statute has no application to a situation such as this, the bank's power to pledge its assets to secure the deposit was not affected by it.

But, even if it were concluded that the Commission Form act had the effect of depriving Illinois state banks of the right to pledge their assets to secure deposits made by Commission Form municipalities, I am of opinion that the amended Act of June 25, 1930, 12 USCA § 90, was not intended to restrict or limit national banks in their theretofore quite generally recognized right to pledge their assets to secure deposits of public funds. While in many relations such security is specifically required by federal statute, I believe this act is no inhibition upon pledging assets to secure public funds in those instances where there is no such statutory requirement.

In providing by the Act of 1930 that national banks may give such security for the safe-keeping and payment of public funds as is authorized by the law of the state in which the national bank is located in the case of other banking institutions of the state, the national bank was placed upon the same footing in respect to bidding for public deposits as were the state banks, with which, quite naturally, they were in competition. Far from thereby withdrawing from the national bank the power it theretofore had to pledge its assets to secure deposits of public funds, the act was, in my judgment, an enlargement of its power, so that, in addition to a general right to pledge assets to secure such deposits, it thereafter had the right, notwithstanding any prior inhibition upon national banks from doing some or any of the things in that regard which might in some particular state be done by the banks thereof. The act was calculated to remove any doubt of the right of the national banks to be on the same footing as the state banks of the several states. An interesting side light in connection with the passage of this act appears in the margin.[3]

---

[3] Referring to this legislation there appears in House Report No. 1637, 71st Congress, 2nd Sess., this letter from Acting Secretary of the Treasury Lowman to Committee Chairman McFadden:

"My dear Mr. Chairman: Reference is made to S. 486, 'An act to amend section 5153 of the Revised Statutes, as amended' which passed the Senate April 1, 1930, and which is now pending before the Committee on Banking and Currency of the House of Representatives.

"While the office of the Comptroller of the Currency has consistently taken the position that national banks have the right to give security for the safekeeping and prompt payment of public moneys of the State or political subdivision thereof deposited with such national banking associations, several recent decisions have thrown some doubt on this question with the result that in some States the State banks may secure the public deposits, but the officers of the State are in doubt about depositing with the national banks in the absence of any specific law by Congress on the subject. It would be extremely helpful, therefore, if it is possible for your committee to report out, and the House pass, S. 486."

Instead of thereby withdrawing or restricting any right of national banks to pledge their assets to secure deposits of public funds, the act of Congress undertook only to remove whatever, if any, possible doubt of such right there might be in any of the states.

We have received copy of an opinion of the Indiana Supreme Court filed March 28, 1933, in Schornick v. Butler, 185 N. E. 111, referred to in note 2 of the opinion herein. The facts there are so like those here, and the discussion is so corroborative of the conclusions stated in this dissent, that I feel justified in commenting thereon.

The appellees, who were directors of a bank, became sureties on the bank's bond to the municipality for public funds which would be deposited in the bank by the municipality. In consideration of becoming sureties, the bank agreed with them that sufficient of its assets should from time to time be set aside and turned over to them as a collateral pledge to insure them against loss upon their bond as sureties. The bank (which the Circuit Court found to have been insolvent at the time the security agreement was made) went into receivership, and action upon the bond was brought by the municipality against the sureties, who thereupon demanded that the agreed collateral be turned over to them. This the receiver of the bank refused to do. Suit was brought by the sureties against the receiver to secure possession of the collateral, and the judgment of the Circuit Court found for the sureties.

The opinion affirming the judgment touches upon several of the propositions I have above considered. The opinion held it to be immaterial whether the assets were pledged directly to the municipality, or to the sureties upon the bond to the municipality for securing the deposit of its funds. It discusses the contention that the pledging of the bank's assets to secure deposits is contrary to public policy, and after some consideration of that question says: "We find no constitutional or statutory enactments, no practices of officials, or judicial decisions in this state indicating that the pledging of collateral to secure deposits is against public policy. There is nothing inherently wrong or immoral in such a transaction. The only decision of this court upon the subject that we have found upholding such an agreement denies such a policy."

Respecting the equities of such a situation, and as bearing on the proposition that such pledges are ultra vires the bank and against public policy, the opinion states:

"The bank parted with an interest in the securities equal to the deposit subject to the condition that, to the extent to which it repaid the cash, it would reclaim the securities. It amounts to no more than a sale of securities at their actual value for cash. The general creditors of the bank lost nothing by the transaction, and, if they are affected at all, they are benefited since the bank is more liquid by reason of having the cash rather than the securities. The appellees gained nothing. The public deposit or its proceeds was used, or will be used, for the payment of general creditors of the bank. No more than an equal amount of the pledged notes will be withheld. The action sounds in equity. The general creditors of the bank or the appellant, their representative, cannot be heard to say that the pledging of the securities was illegal while they retained the benefits of the transaction. Melaven v. Hunker et al., 35 N. M. 408, 299 P. 1075. It would be unconscionable to permit the general creditors to profit where they had no loss, at the expense of the appellees, who have profited nothing and have done no wrong. It must not be permitted unless there is some insuperable rule of law which requires it."

The court refers to the public depository law of Indiana, section 12621 (Burns' 1926) which requires banks receiving public deposits to give the municipality a bond to secure the same. Section 12622 provides that in lieu of such bond the bank may pledge specified classes of municipal bonds, or bonds of the United States or of the state of Indiana, to secure such deposits. The securities there agreed to be pledged were not such as the statute authorized a municipality to take, and were not given or to be given to the municipality itself; and so in that case, as in the case at bar, the pledge did not comply with the statute, and to sustain the pledge resort must be had to the general power of a bank to pledge its assets as security for such deposits. As to this the opinion says:

"Our banking law (see Burns' Ann. St. 1926, § 3844 et seq.) gives banks 'all the powers incidental and proper, or which may be necessary and usual in carrying on the business of banking.' The right of a bank to borrow money and pledge its assets for the payment thereof is beyond serious question. It is urged, however, that a deposit is not a loan and that banks have no power to pledge their assets to secure deposits. There is no reason for the distinction. In either case the relation of debtor and creditor is created. It has been expressly held by this court that an agreement to assign collateral as security for

a certificate of deposit will be enforced, and in answer to the contention that the transaction constituted an ordinary deposit and not a loan, the court said:

" 'As to how it should be regarded in this respect—whether as a loan or a deposit—is not material, under the facts in this case; for, if it be considered as an ordinary deposit, its effect would be to create the relation of debtor and creditor between appellee and appellant's bank.' Harris et al. v. Randolph County Bank, 157 Ind. 120, 60 N. E. 1025, 1032.

\* \* \*

"The Legislature recognized the right of a bank to pledge collateral to secure the payment of ordinary deposits when it enacted the depository law. An examination of the title and body of that act clearly discloses that it was not intended to affect the powers of banks. It merely fixed the terms and conditions upon which public officers may make deposits in banks."

The Indiana statute respecting the general power of banks does not in essence differ from that of Illinois on the same subject. The Schornick opinion recognizes the *power* of banks to make pledge of its securities to secure deposits *of public or private funds;* and the opinion in the Harris Case, supra, holds that in a private transaction involving an agreement to pledge the bank's assets as security it was immaterial whether the transaction was a loan to the bank or a deposit. Although some cases distinguish as between pledges to secure public and private deposits, and between deposits and loans, I can see no adequate reason for the distinctions. However, in my judgment those distinctions are not material here, where the deposit was of public funds.

The last above quoted paragraph indicates that the public deposit statute of Indiana, in specifying what security for deposits the municipality must require, did not affect the power of the bank to pledge assets, but "merely fixed the terms and conditions upon which public officers may make deposits in banks."

In another place, referring to the contended difference between a deposit and a loan to the bank, and its right to pledge for the latter and not the former, the opinion says: "The basic contractual obligation to pay is the same and, if when the money is received the bank assigns collateral as a guaranty of its repayment, we know of no rule or reason which would permit the collateral to be retained in one case and not in another."

The note 2 refers to the unusual circumstance that in a prior opinion in the same case by the same court, filed July 3, 1930, and reported in 172 N. E. 181, conclusions were stated diametrically opposite to those announced in the later opinion. In the first opinion the Circuit Court was reversed; and, petition for rehearing having been granted, in the second judgment was affirmed.

The note also calls attention to the fact that in the interim the personnel of the court had changed, leaving on the bench only one of the five members who participated in the first opinion, and he dissenting therefrom. It is quite true that the first opinion was not unanimous (two dissenting therefrom). The materiality of this is not apparent, beyond indicating the likelihood that in each instance the case had the careful consideration of the court.

Whether tested by the laws and the public policy of the state of Illinois or of the United States, or of both, I believe this pledge of the bank's assets should be sustained; but that, in any event, an order directing return of the securities should be conditioned upon payment of the amount of the deposits to secure which, directly or indirectly, the securities were pledged.