## BALTIMORE & O. R. CO. et al. v. SMITH et al.

### No. 4675.

Circuit Court of Appeals, Third Circuit.

March 10, 1932.

DICKINSON, District Judge, dissenting.

William Booth, Allen T. C. Gordon, Smith, Buchanan, Scott & Gordon, and C. Roscoe Hoffman, all of Pittsburgh, Pa., for appellants.

Henry E. Hackney and Shelby, Hackney & Ray, all of Uniontown, Pa., for appellees.

Before DAVIS, Circuit Judge, and DICKINSON and AVIS, District Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court holding that it was against public policy for a national bank to pledge its assets to secure the deposits of a private depositor.

On February 23, 1928, the Baltimore & Ohio Railroad Company, hereinafter called the "railroad," had on deposit in the First National Bank of Connellsville, Pa., $30,- 593.39. On that day an agreement was entered into between the bank and the railroad whereby the bank agreed to deposit, and thereafter did deposit, certain of its bonds aggregating $54,000 in value with the Bank of Pittsburgh, N. A., Pittsburgh, Pa., as trustee to secure the deposits which the railroad then had in the bank and any additional sums which it might in the future deposit therein.

On March 28, 1928, the First National Bank assigned and transferred substantially all of its assets, including its securities with the Bank of Pittsburgh, N. A., to the Citizens' National Bank of Connellsville, which assumed and agreed to pay and discharge all the liabilities and obligations of the bank.

The amount on deposit in the Citizens' National Bank on July 30, 1930, to the credit of the railroad was $40,000. On that day, the railroad deposited $2,915.83 with the Citizens' National Bank which drew its draft on the First National Bank of Pittsburgh, a correspondent, for that amount to the order of the Bank of Pittsburgh, N. A. The draft was mailed to the Bank of Pittsburgh, N. A., with instructions to place it to the credit of the railroad, but before it was presented for payment the following day, July 31, 1930, the Citizens' National Bank was declared to be insolvent by the Comptroller of the Currency and the bank closed. Shortly thereafter the draft was presented to the First National Bank of Pittsburgh for payment, but it refused. When the Citizens' National Bank closed, the amount due the railroad was $42,- 915.83, which included the amount of the draft. A receiver was immediately placed in charge of the closed Citizens' National Bank. On September 25, 1930, the railroad drew its two checks upon the Citizens' National Bank, one for $40,000 and the other for $2,915.83, and presented them to the receiver for payment, but he refused to pay.

On January 13, 1931, the railroad requested the bank of Pittsburgh, N. A., to sell at the market price so much of the securities deposited with it as was necessary to pay the two checks. Three days thereafter, January 16, 1931, the receiver filed a bill in equity in the District Court against the Bank of Pittsburgh, N. A., and the railroad, as defendants, because the Bank of Pittsburgh, N. A., which had not yet sold the securities, was threatening to do so and prayed for a restraining order against it. Answer was filed and the case was heard on a stipulation of facts. The court entered a decree enjoining the Bank of Pittsburgh, N. A., from

selling or disposing of the securities deposited with it other than by delivery of them to the receiver and directing it to deliver to the receiver the securities free from any pledge, right, title, interest, or claim the bank or the railroad had to them.

An appeal was taken to this court, and the sole question is whether or not the First National Bank of Connellsville had power to pledge its property to secure the deposits of the railroad; or, to state it generally, does a national bank have power to pledge its property to secure a deposit of a private depositor?

Admittedly it has no express power, and if it has any implied power, it must be found in paragraph 7 of section 5136 of the Revised Statutes of the United States (12 USCA § 24 (7), which reads as follows: "Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

Power is thus given to conduct a banking business and all incidental power necessary to carry it on. First National Bank of Charlotte v. National Exchange Bank of Baltimore, 92 U. S. 122, 23 L. Ed. 679; Aldrich v. Chemical National Bank, 176 U. S. 618, 20 S. Ct. 498, 44 L. Ed. 611. Implicit power must be found, if at all, in the words, "all such incidental powers as shall be necessary to carry on the business of banking." The final question comes to this: Is the power to pledge a bank's property to secure private deposits necessary to carry on the business of banking?

There is no evidence showing that it is necessary. On the other hand, inference is fairly reasonable that thousands of successful banks have never exercised such power. It cannot be concluded from the evidence that the exercise of such power is necessary in order to carry on the business of banking successfully.

It is admitted that whenever the Comptroller was asked for an opinion as to the power of national banks to pledge collateral to secure private deposits, in every instance, he has disapproved of such pledges and held that, in his opinion, national banks do not have that power. Such uniform and long-continued interpretation and practice of an act by the department charged with administering it has great weight and is persuasive as to its correct construction. Corsicana National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141; Kern River Co. v. United States, 257 U. S. 147, 42 S. Ct. 60, 66 L. Ed. 175; First National Bank in St. Louis v. State of Missouri, 263 U. S. 640, 44 S. Ct. 213, 68 L. Ed. 486.

The National Banking Act of 1864 (13 Stat. 113, § 45 [12 USCA § 90 and note]) authorized the Secretary of the Treasury to designate national banks as "depositories of public money," but provided that he "shall require the associations thus designated to give satisfactory security, by the deposit of United States bonds and otherwise, for the safe-keeping and prompt payment of the public money deposited with them."

The next act authorizing national banks to pledge assets to secure deposits was in 1910 when Congress passed the Postal Savings Act (36 Stat. 816, § 9 [39 USCA § 759]), which permitted deposits of postal savings funds in banks, but provided that the administrative officers "shall take from such banks" security to insure the safety and prompt payment of such deposits.

In 1916 the National Banking Act (section 50) was amended (12 USCA § 192) so as to authorize the Comptroller of the Currency to permit the deposit of money by receivers of insolvent national banks in state or national banks, but provided that they should require the deposit of "United States bonds or other satisfactory securities" for the safe-keeping and prompt payment of such deposits.

Again in 1930, section 45 of the National Banking Act was amended (12 USCA § 90) by the addition of the following: "Any association may, upon the deposit with it of public money of a State or any political subdivision thereof, give security for the safe-keeping and prompt payment of the money so deposited, of the same kind as is authorized by the law of the State in which such association is located in the case of other banking institutions in the State."

These acts, together with three other acts —one in 1911 (36 Stat. 1070, § 17 [25 USCA § 156]) regarding the deposit of Indian moneys, one in 1917 (40 Stat. 291, § 8 [31 USCA § 771]) with regard to the deposit of moneys received from the sale of United States bonds, and one in 1918 (25 USCA § 162) providing for the deposit of certain In-

dian funds in banks to be designated by the Secretary of the Interior—permit the deposit of public money in national banks, but in each case require the funds to be secured.

■ A national bank has only the power expressly given to it and such incidental powers as are necessary to carry on the business of the powers expressly given. In none of these acts is any mention whatever made of the power to pledge assets to secure private deposits. If Congress had intended to give such power to national banks, it would have expressly indicated such intention. The fact that it did authorize national banks to pledge their property to secure public deposits, but was silent as to private deposits, clearly indicates that it did not intend to give that power in the case of private deposits.

The reports of the Senate and House committees, on the amendment of 1930 to the Banking Act, show that Congress intended to deny that power to national banks in the case of private deposits:

"In Senate Report No. 67, 71st Cong. 2nd Sess., the committee based its favorable report upon a letter from the Attorney General of Minnesota, reading in part as follows: 'The United States district court for this district has held that it may not thus pledge its assets to secure private deposits and the trend of authority generally seems to be to the effect that a bank may not in any case pledge its assets to secure a deposit unless authorized by law so to do. The national banks of this State have pledged with the State and the various subdivisions thereof millions of dollars in Government and other bonds as security for public deposits. They are anxious to be permitted to do so, and we are willing that they should. Under the law as it now stands we may be taking a chance in accepting such pledges from the national banks, and we should like to have the chance removed by legislation in Congress which will specifically authorize such pledges by national banks.' "

"From House Report No. 1657, 71st Cong. 2d Sess., it appears that the committee reported favorably upon the bill (S. 486) because of a request from the Acting Secretary of the Treasury, reading in part as follows: 'While the office of the Comptroller of the Currency has consistently taken the position that national banks have the right to give security for the safe-keeping and prompt payment of public moneys of the State or political subdivision thereof deposited with such national banking associations,

several recent decisions have thrown some doubt on 'his question with the result that in some States the State banks may secure the public deposits, but the officers of the State are in doubt about depositing with the national banks in the absence of any specific law by Congress on the subject. It would be extremely helpful, therefore, if it is possible for your committee to report out, and the House pass, S. 486.' "

■ The charter of a corporation is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made beyond the scope of those powers are unlawful and void, and no action can be maintained upon them in the courts. Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24, 48, 11 S. Ct. 478, 35 L. Ed. 55. The pledging of the assets of a national bank to secure a private deposit is not fairly incidental or necessary to carry on the business of banking. Such a contract is not only voidable but wholly void and of no legal effect.

The appellant contends that if the bank did not have power to pledge its assets to secure the private deposit in question, the receiver cannot compel the return of the securities without paying the deposit balance.

■■ Courts have nothing to do with determining the policy which national banks should pursue. That is a question for the Comptroller of the Currency and the banks themselves so long as that policy is not unlawful and does not offend against public policy. But when it is unlawful and contrary to public policy, then the courts have jurisdiction. It was entirely legal and proper for the railroad to deposit its money in the bank, but it and the bank went further and entered into an illegal agreement which resulted in an illegal act. The receiver repudiates this agreement and demands the return of the securities. The railroad has called on the bank or the receiver for its deposit. This it has the right to have and to that extent the bank is its debtor, but in the meantime the bank has become insolvent and is unable to pay in full. Accordingly the railroad must stand with, and not ahead of, the other depositors. All must share alike. The railroad now stands just where it would have stood, had it continued as other depositors did and not required the bank to do an unlawful act which is null and void. The agreement and deposit of these securities are of no effect, just as though they did not exist. Therefore the railroad must now

be accorded the same treatment as other depositors and share pro rata with them. It cannot now take advantage of the illegal agreement and thus accomplish exactly what Congress sought to prevent by withholding power from national banks to pledge their assets to secure private depositors.

If a national bank has power to pledge its assets to secure the deposit of one private depositor without the knowledge of its other depositors, the mere possibility of the exercise of this favoritism and preference would breed distrust in depositors and lessen their number. The power conferred upon national banks should not be so interpreted as to authorize an injurious policy unless a fair construction of the language clearly requires it.

It follows that the receiver has the right to disaffirm the contract and recover the pledged securities.

The decree is affirmed.

DICKINSON, District Judge (dissenting).

The ruling in this cause deeply affects banking practices and the conduct of banks of deposit. The subject of the ruling has evoked sharply contrasting views. The majority opinion gives one view, and it is thought not to be out of place to give the other. We apologize in advance for the length of this discussion. The broad question is the right or privilege of a national bank to secure a private deposit by a pledge.

1. It is a circumstance of some significance that the court below and this court, although in accord in the ruling made, differ over the grounds for the ruling. The trial judge, while doubting—perhaps more than doubting—the power of the bank to give such pledge, yet plants its denial of the right, not on the lack of power, but on the principle that the practice is condemned and forbidden by the policy of the law. This view he has expressed in as terse and compact phrases as could be penned. This court, on the other hand, plants the ruling, not on any condemnation of the practice—although evidently disapproving of it—but on the lack of power in a national bank to secure private deposits. We respectfully but firmly differ on both grounds and maintain: (1) That national banks possess the power, and that (2) the practice is not condemned by any policy of the law nor does it conflict with any principle of economics in general or of sound banking in particular.

2. First as to the power: There is a common starting point in the principle that as we are in search of a corporate power it must be found in the act creating the corporation. This court then follows with the proposition that if the power exists it is to be found in the grant of the power to do a banking business, including the implied power to do all things necessary to this end. It is just here that we part company with the majority of this court. If they are right in this proposition, we concede all the rest of the argument and accept the conclusion reached because it logically follows. We would not rest the power on one implied because necessary to the conduct of a banking business, because the power to receive deposits is not necessary to a banking business. This we not only admit but proclaim. The majority of the court has not been impressed as we are with a difference among banks. There are banks and banks of deposit. There may be, have been, and are, those engaged in the business which goes under the generic name of banking to whom the power to receive deposits has by law been denied. There may be, and are, corporate bodies empowered to do a banking business and yet from whom the power to receive deposits has been withheld. There are others upon whom the power to be banks of deposit or to receive deposits has been expressly in so many words conferred. We would plant the power in the instant case, not upon any implication from the other power to do a banking business, but upon the express power granted to national banks to receive deposits. The act (12 USCA § 24) confers the general power to do a banking business (inter alia) "by receiving deposits." Of course, no one would deny their power to receive deposits. How then can the power to agree on terms with any depositor be denied them? Here it will be noted how fundamental is the question of the source of the power. If it comes, if at all, as incidental to the power to do a banking business, we concede, as already conceded, that deposits are not necessary to the doing of a banking business. Banks are eager for deposits and of course the power to receive them, not because deposits are necessary to a banking business, but simply because deposits are the cheapest and hence to the banks the most profitable form of capital which they can employ if they can get them on terms favorable to the banks. Hence if the power to receive deposits is derived wholly and solely from the power to do a banking business, it logically follows, as the court has found and as we have conceded, that the power is not possessed. If, however, the power to receive deposits is ex-

pressly given (as it has been), then the only question is whether there is an implied power to agree with the depositor on terms. We will recur to the subject later, but we may interpolate here that there are many ways of attracting deposits. One is by assuring the safety of the deposit; another is by paying a more or less high rate of interest. Can it be that the bank has power to do the one but not the other? So far as we can see into it, the bank must meet the depositors' terms or do without the deposit. The power to agree upon terms is necessarily an incident of the power to receive.

3. Executive construction of the act: We are not as much impressed by the opinions of individual comptrollers as the majority of the court has been. We grant the rule of construction that when the executive has construed an act of Congress in order to carry it into effect that the courts will not lightly change the executive interpretation of the meaning of the act. It may be and usually is disrupting to so do. There has, however, been no such executive or administrative construction given to this act. The practice has of late grown up, and recent happenings in banking circles has doubtless furthered it for depositors, particularly those carrying large balances such as railroads, trustees for estates, and banking institutions to ask for and receive security for their deposits. Comptrollers have known of this. Some of them have doubtless scolded; but they have permitted it, and one or two of them have publicly announced their disapproval of the practice. Actions speak louder than words. All disruption there may be, will result from the ruling that the banks are without the power to do this.

4. Secured public deposits: There is at first sight something impressive in the comment that the law has expressly conferred the power to secure deposits of public moneys, but that all these acts are silent respecting private deposits, and hence there is an implied denial of the power to secure the latter. It will readily be seen, however, that the rule of construction invoked cuts the other way. The original act although silent on the subject of the implied power to secure deposits forbids all such pledges by an insolvent bank. Does this not mean that solvent banks may make such pledges? Another thing to which we will recur later is that the law which authorized officials to deposit public moneys with the banks required them to exact security for all such deposits. The point made is that such security was required before any of the acts expressly conferring the power to give such security were passed. It is true that there are now acts which expressly confer authority to secure public deposits but none to secure private deposits. The genesis of such acts takes away all significance which they might otherwise have in respect to the question under discussion. Some official was concerned over the deposit of public moneys for which he was responsible. He asked for relief and Congress gave it to him without concerning itself with the effect of the legislation upon others. Legislatures not infrequently do this. Had these provisions been part of the original act which conferred the power, they would have great significance. If, however (as we think is true), the original act gave the power, the question becomes, not whether the subsequent legislation confers it, but whether it takes away a power before given. We suppose no one would urge that it does.

5. The policy of the law: This takes us into the domain of economics, a subject the limits of which are expansive and elastic. The practice said to be condemned as against the policy of the law is that of securing depositors. The first query aroused is how any act or practice can be one which the law condemns when it is the very act or practice which the law enjoins. The banking policy or practice of securing deposits may be wise or foolish, sound or unsound, good or bad. There may or may not be room for a difference of opinion on the subject, but the policy or practice is the same whether the deposit secured is that of A or B. How can A insist that the bank secure his deposit and yet condemn the bank for doing something against the policy of the law if the deposit of B is likewise made secure? Does it change the situation any if A is an official or the moneys deposited by him are public moneys? We are not speaking of the power or wisdom of the Legislature in laying down one rule of policy for public deposits and another for private but of the wholly different question of whether the courts should condemn as against the policy of the law something which the law enjoins when its own interests are affected. It is easy to understand that any banking practice may in the judgment of the members of a court be condemned as unwise or even ruinous in its consequences, but can it for this reason be found to be illegal because against the policy of the law? Underlying this whole thought of illegality is an old, discarded, but still lingering concept of the relation of bank and depositor. The concept is of something which partakes of a trust relation. The moneys of the depositor

are to be kept by the bank for him in the original package. Doubtless those could yet be found who would be startled by the information that the soundest and best managed banks invested the money of their depositors as if it were their own. The relation of bank and depositor is that of debtor and creditor. None the less it must not be forgotten that banks as debtors to their depositors belong to a unique class. They are the only debtors whose prosperity is directly measured by the volume of their deposit debts. The lamentations over the condition of debtors with which all literature, sacred and profane, is filled were not written of banks or for bankers. Debtors rejoice when the sum of their debts is reduced, but no bank is heard to rejoice when its line of deposits declines. The reason is that from the banker's point of view deposits are a form of capital and, as before stated, the cheapest form of capital they can employ. Many changes have come over banking practices. Bank managers looked at one time chiefly to their stockholders for their capital. Banks were then conducted for the benefit of their stockholders to whom all profits went. In more recent years much the larger part of their capital is supplied by their depositors with whom profits are shared in the form of interest. The "capital" in the form commonly understood by that term is little more than a reserve to give the assurance of safety to depositors. Indeed, capital as such is no longer necessary and we have in fact banks of deposit which have no capital in the form of capital stock. This change doubtless explains the phenomenon that in cases of bank failures there is a widespread sympathy expressed for depositors, but none is ever heard for the more unfortunate stockholder. This change has been brought about by the practice of paying interest. It began with long-time certificates of deposit which were not subject to check. It extended from certificate holders to depositors who kept substantial balances and from them to all depositors. Those, who are not yet much beyond middle age, can well remember how the then new policy of paying interest to depositors was deplored and opposed by conservative bankers. Some of them recently may have had the satisfaction of saying "I told you so." This record is full of direful forebodings of what would befall banks if it became known that they secured the payment of deposits. It is the fashion to think of the action of depositors in terms of mob psychology. Into this we will not go, but if a large depositor (say a railroad company) was solicited by a bank for its deposits and the bank was informed that the company had a rule to require security for its deposits or otherwise to be paid interest, what choice would a sound well-managed bank make? Would any depositor be alarmed if the bank chose to give security? There are a few truths which are self-evident. No bank volunteers to give security for any deposit. It is only done when the deposit cannot be had without it. It is usual to speak of depositors as subject to unreasoning alarms resulting in panics and consequent so-called "runs" followed by senseless hoarding. The plain truth is that banks are as prone to panics and hoarding as are depositors. The only difference is that the alarm of depositors may be unreasoning and unjustified, but the panic and hoarding of the banks is cool, deliberate, and indeed forced upon them. They cannot do otherwise. Another truth is that all are the victims of a vicious monetary system. We say "vicious" because it aggravates the evils which it should abate. The only reason we submit to it is that no one has as yet come forward with a better system. In fat years, deposits are piled upon the banks and the moneys must be invested. When the lean years come, deposits decline and the banks are compelled to restrict their credits, to call in their loans, and sell their investment securities, thus increasing the "depression" by throwing their customers' securities upon an already sagging market. This means that buying is done upon a rising and selling upon a falling market. With respect to banking policies the managers of no bank have the wish to harm it, and any policy which is followed by the banks is quite as likely to be sound if left to the judgment of trained bankers as it is if dictated by the courts following any supposed policy of the law.

A word should be added on behalf of the depositor. He may be the trustee of an estate holding moneys for which he and his sureties are responsible. Why should he be denied a protection which is granted to the custodian of public moneys? Surely neither the bank nor other depositors are harmed and may be benefited. Assume the case of such a trustee with a large deposit balance. He may have no need to withdraw his moneys but he may be alarmed. If secured, he will leave his moneys with the bank. If not secured, what may he do and with what consequences to the bank, to its stockholders, and its other depositors?

The decree below should be reversed.