399 F.2d 1010
 James J. SAXON (Succeeded in Office by William B. Camp on
February 1, 1967), Comptroller of the Currency of
the United States of America, Appellant,
v.
GEORGIA ASSOCIATION OF INDEPENDENT INSURANCE AGENTS, INC.,
et al., Appellees.
The CITIZENS AND SOUTHERN NATIONAL BANK, Appellant,
v.
GEORGIA ASSOCIATION OF INDEPENDENT INSURANCE AGENTS, INC.,
et al., Appellees.
 Nos. 25050, 25060.
 United States Court of Appeals Fifth Circuit.
 Aug. 12, 1968, Rehearing Denied En Banc in No. 25060 Oct. 28, 1968.
 
 Charles L Goodson, U.S. Atty., Slaton Clemmons, Edwin L. Weisl, Jr., Asst. Attys. Gen., Atlanta, Ga., Alan S. Rosenthal, Leonard Schaitman, Attys., Dept. of Justice, Washington, D.C., for appellant Saxon.
 Henry J. Miller, John K. Train, III, Atlanta, Ga., for appellant Citizens & Southern Nat. Bank.
 E. Smythe Gambrell, Charles A. Moye, Jr., James H. Bratton, Jr., Edward W. Killorin, Gambrell, Russell, Moye & Killorin, Theodore M. Forbes, Jr., J. Arthur Mozley, Atlanta, Ga., for appellees.
 
 
 1
 Before GEWIN and THORNBERRY, Circuit Judges, and ELLIOTT, District judge.
 
 ELLIOTT, District Judge:
 
 2
 These two actions[1] were brought by Appellees (Plaintiffs below) to have declared unlawful Appellant Comptroller's 1963 Ruling No. 7110 and to enjoin Appellant Citizens and Southern National Bank's insurance agent and agency activities in Georgia cities of over 5,000 population. The individual Appellees are duly licensed independent Georgia insurance agents. The National Association of Insurance Agents, Inc. is an incorporated professional association of approximately 35,000 independent insurance agencies, which includes approximately 150,000 licensed independent insurance agents located throughout the United States. The Georigia Association of Independent Insurance Agents, Inc. is an incorporated professional association of approximately 3,000 licensed independent Georgia insurance agents. The individual plaintiffs and the agent members of the two associations above named engage in their licensed profession for a livelihood and all of them have a substantial interest and investment in their profession in terms of time, money and effort. A considerable portion of the insurance agency business of the individual plaintiffs and of the agent members of the two associations is devoted to the sale and writting as agent of various forms of automobile and home insurance. The individual plaintiffs sue individually and on behalf of all similarly situated licensed independant insurance agents in the State of Georgia and the Associations sue individually and as the representatives of their agent members.
 
 
 3
 Two provisions of the National Bank Act (Title 12, U.S.C.A.) are involved:
 
 
 4
 Section 24(7), enacted in 1864, grants to national banks 'all such incidental powers as shall be necessary to carry on the business of banking'.
 
 
 5
 Section 92, enacted in 1916, provides that national banks 'located and doing business in any place the population of which does not exceed five thousand inhabitants * * * may, under such rules as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life or other insurance company authorized by the authorities of the State in which such bank is located to do business in said State * * *.'
 
 
 6
 In this statutory setting James J. Saxon (the original defendant below in Case No. 25050)[2] was secretary of an Advisory Committee appointed by the United States Senate in 1956 to make a study of the national banking laws and to make suggestions concerning revisions. He and the Advisory Committee drafted and recommended passage of legislation which would have allowed national banks in cities of more than 5,000 population to act as insurance agents if state chartered banks could do so under State law. This legislation was proposed in Congress at the Financial Institutions Act of 1957. After consideration and debate by the Congress this legislative proposal as drafted and recommended by Mr. Saxon and the Committee of which he was a member was rejected by Congress.[3]
 
 
 7
 In 1961 Mr. Saxon became Comptroller of the Currency and in 1962 Comptroller Saxon created a 'National Advisory Committe on Banking Regulatory Policies and Practices', which committee was composed entirely of persons affiliated with the banking business. Comptroller Saxon asked this committee to make suggestions and recommendations to him for changes in the laws, policies and regulations affecting national banks. In due course Mr. Saxon's Advisory Committee recommended with regard to the insurance agency matter that 'appropriate legislation should be enacted expressly to permit any National Bank to act as broker or agent in the writing of * * * insurance issued in connection with a loan by the bank, and to participate in premium experience refunds. * * *'[4] Instead of asking Congress for the 'appropriate legislation' recommended by the committee, Comptroller Saxon in 1963 simply converted that recommendation into an administrative ruling, that being Ruling No. 7110, which is the subject of this inquiry, the full text of which provides:
 
 
 8
 'Incidental to the powers vested in them under 12 U.S.C. Section 24, 84 and 371, National Banks have the authority to act as agent in the issuance of insurance which is incident to banking transactions. Commissions received therefrom or service charges imposed therefor may be retained by the bank.'
 
 
 9
 This ruling was not limited in scope to cities of 5,000 population or less and purported to authorize every national bank, regardless of where located, to enter the insurance agency field and to compete with Appellees and other insurance agents.
 
 
 10
 In 1964 by an exchange of letters Appellant C & S Bank requested and received Comptroller Saxon's specific approval of the Bank's entry 'into the insurance agency business', and in 1965 the Bank in its Atlanta offices began selling to borrowers broad forms of automobile, home, casualty and liability insurance, and the program was subsequently extended to its national bank offices in the cities of Athens, Augusta, Macon, Savannah and Valdosta, each of which has a population in excess of 5,000.
 
 
 11
 To protect their business from what was alleged to be unlawful encroachment by the bank, Appellees brought suit against the Bank, federal jurisdiction being based upon 28 U.S.C. 1331(a), 1348 and 1391, and against Comptroller Saxon, jurisdiction being based upon 28 U.S.C. 1331(a) and 1391(e) and 5 U.S.C. 1009.
 
 
 12
 After overruling Appellants' motion to dismiss (260 F.Supp. 802), the District Court granted Appellees' motion for summary judgment (268 F.Supp. 236) And subsequently entered judgments declaring Comptroller Saxon's Ruling No. 7110 unlawful and in excess of statutory authority and declaring unlawful the Bank's insurance agent, and agency activities in cities of more than 5,000 population.
 
 
 13
 We affirm the judgments of the District Court.
 
 
 14
 Two questions are presented for consideration:
 
 
 15
 (1) Does Section 92 of the National Bank Act impliedly prohibit national banks from carrying on the business of insurance agents in places of more than 5,000 population; (2) Did the plaintiffs below (Appellees here) have standing to bring these suits?
 
 
 16
 Appellants contend that authority for national banks located in cities of over 5,000 population to act as insurance agents may be inferred from the general provisions contained in Section 24 (7) of the Act, heretofore set out in pertinent part, this Section allowing national banks to exercise, subject to law, all such 'incidental' powers as shall be 'necessary' to carry on the business of banking. The District Court held that the specific grant of insurance agency power contained in Section 92 of the Act, heretofore set out, is the full extent of the insurance agency power possessed by national banks, and that an insurance agency power may not be inferred from the provisions of Section 24(7). Adjudication of the first question presented, therefore, hinges upon the proper construction to be given to these two sections of the Act.
 
 
 17
 Pertinent to consideration of these statutory provisions, we take note of the fact that prior to the 1916 enactment of Section 92 it seems to have been universally understood that no national banks possessed any power to act as insurance agents. Section 24(7) was contained in the original National Bank Act of 1864. Between that time and 1916 when Section 92 was enacted, the various administrative agencies charged by law with the administration of the Bank Act consistently ruled that national banks had no power to act as insurance agencies. In 1915 the Federal Reserve Board held that:
 
 
 18
 'National banks have no express or implied power to write fire, cyclone, liability, or other kinds of insurance.
 
 
 19
 '* * * writing insurance on commission is in no sense incidental to any of the enumerated powers of a national bank.
 
 
 20
 'Inasmuch, therefore, as this class of business does not come within either the expressed or implied powers of national banks, an administrative board or officer cannot authorize it. Any such extension of the powers of national banks must be left to the consideration of Congress.' 2 Fed. Reserve Bull. 73, 74 (1916).
 
 
 21
 Immediately prior to the enactment of Section 92 in 1916 the office of the Comptroller of the Currency ruled that national banks possessed no power to act as insurance agents, Congress being told by the then Comptroller:
 
 
 22
 'National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies. * * *
 
 
 23
 'It is certainly clear that the Comptroller of the Currency has no right to authorize or permit a national bank to exercise powers not conferred upon it by law.' 53 Cong.Rec. 11001 (1916).
 
 
 24
 The Comptroller then recommended to Congress that it grant insurance agency power to national banks located in small towns, submitting to Congress a draft of a proposed amendment to the , national Bank Act which Congress enacted and is now Section 92 of the Act. 53 Cong.Rec. 11001 (1916).
 
 
 25
 In interpreting the meaning of one provision of an act it is proper that all other provisions in pari materia should also be considered. So, in construing the general authority contained in Section 24(7) we must give equal consideration to Section 92 as it specifically deals with the power of national banks to act as insurance agents, and when the general language in Section 24(7) dealing with 'incidental' powers is construed in conjunction with the specific grant in Section 92 it is clear that application for the expressio unius est exclusio alterius rule requires the construction that national banks have no power to act as insurance agents in cities of over 5,000 population.
 
 
 26
 In Continental Casualty Company v. United States, 314 U.S. 527 S.Ct. 393, 86 L.Ed. 426 (1942), the court stated:
 
 
 27
 'a 'legislative affimrative description' (of certain powers) implies denial of the non-described powers.'
 
 
 28
 This rule was elaborated upon somewhat in Service Life Insurance Company v. United States, 293 F.2d 72 (8 Cir. 1961), where it was said that:
 
 
 29
 'As an adjunct to the rule that the specific takes precedence over the general, it is further established as a principle of statutory donstruction that 'when a statute limits a thing to be done ina particular mode, it includes the negative of any other mode."
 
 
 30
 Since Congress dealt specifically with the insurance agency power in Section 92, the expressio unius rule negates the existence of any other power to act as an insurance agent under the general provisions of Section 24(7).
 
 
 31
 There is ample precedent for the conclusion that a power which has been withheld or denied by Congress cannot be found to exist as an 'incidental' and 'necessary' power and that principle had been applied several times to the National Bank Act. First National Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924), (establishment of branch banks); Baltimore & Ohio Ry. Co. v. Smith, 56 F.2d 799 (3 Cir. 1932), (pledge of assets).
 
 
 32
 Although the cases before us seem to represent the first instance in which the issue of whether national banks have insurance agency powers in cities of over 5,000 population has been directly presented, there have been other cases in which this question has been raised collaterally or incidentally, in which cases the courts have concluded that the banks' power is limited as we here find it to be. The most recent of such cases appears to be Commissioner of Internal Revenue v. Morris Trust, 367 F.2d 794 (4 Cir. 1966), which involved the merger of a state bank into a national bank. At issue was the tax treatment of a preliminary step in the merger by which the state bank divested itself through a 'spin-off' of its insurance department. An important question in the case was whether there was a sound business reason (other than tax avoidance) for the spin-off. The Court said:
 
 
 33
 'For many years, American (the state bank) had operated an insurance department. This was a substantial impediment to the accomplishment of the merger, for a national bank is prohibited from operating an insurance department except in towns having a population of not more than 5,000 inhabitants.[3] To avoid a violation '3. 12 U.S.C.A. 92. * * *' of the national banking laws, therefore, and to accomplish the merger under Security's national charter, it was prerequisite that American rid itself of its insurance business.'
 
 
 34
 This Court of Appeals' decision upheld the ruling of the Tax Court below that:
 
 
 35
 'The divestment of the insurance department was necessary because of the legal requirement that a national bank, which the consolidated bank was to be, would not be permitted to engage in the insurance business in a city the size of Charlotte.' 42 T.C. 779, 785 (1964).
 
 
 36
 In Washington Agency, Inc. v. Forbes, 309 Mich. 683, 16 N.W.2d 121 (1944), the Michigan Supreme Court, in deciding a case which involved the relationship by a bank and an insurance agency commented:
 
 
 37
 'Congress views with none too great favor a national bank acting as insurance agent, forbidding it in places of 5,000 or more population.'
 
 
 38
 The Massachusetts Supreme Court in Dresser v. Traders' National Bank, 165 Mass. 120, 42 N.E. 567 (1896), held ultra vires a contract whereby a national bank agreed to act as a sub-agent for an insurance agent. It is to be noted that this case arose before enactment of Section 92 of the National Bank Act and the Court rendered its decision considering the 'incidental' and 'necessary' powers of Section 24.
 
 
 39
 If there be any doubt as to the meaning of the statute it is our function to construe the language of the statute so as to give effect to the intent of Congress, and an examination of the legislative history of Section 92 is helpful in the circumstances of this case. As heretofore noted, Section 92 became a part of the National Bank Act in 1916. In March of that year a bill was introduced to amend the Federal Reserve Act, this being identified as H.R. 13391, 64th Cong., 1st Sess. This bill contained no insurance agency provision the question of insurance agency powers arose during consideration of the powers that were available to foreign banks as distinguished from domestically chartered national banks. In July, 1916, during the consideration of this House Resolution on the floor of the Senate, the Chairman of the Senate Banking and Currency Committee inserted in the record a letter which the Committee had received from the then Comptroller of the Currency. 53 Cong.Rec. 11001 (1916). This letter from the Comptroller dealt with problems facing national banks located in small towns, particularly their difficulty in deriving a profit from their banking business. In order to provide these banks located in small communities with an additional source of revenue the then Comptroller recommended that Congress give these national banks in small communities authority to act as insurance agents. After referring to the authority contained (or, more precisely, not contained) in Section 24(7) the Comptroller said:
 
 
 40
 'National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies. * * *
 
 
 41
 'It is certainly clear that the Comptroller of the Currency has no right to authorize or permit a national bank to exercise powers not conferred upon it by law.
 
 
 42
 'My investigations lead me respectfully to recommend to Congress an amendment to the national bank act by which national banks located in villages and towns having a population of not exceeding 3,000 may be permitted to act as agents for insurance companies in the placing of policies of insurance-- fire, life, ect. * * *
 
 
 43
 'It seems desirable from the standpoint of public policy and banking efficiency that this authoirty should be limited to banks in small communities. This additional income will strengthen them and increase their ability to make a fair return to their shareholders, while the new business is not likely to assume such proportions as to distract the officers of the bank from the principal business of banking. Furthermore in many small places the amount of insurance policies written or mortgages to be placed on commission is not sufficient to take up the entire time of an insurance broker, and the bank is not therefore likely to trespass upon outside business naturally belonging to others.
 
 
 44
 'I think it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and expert bankers. I think it would be unfortunate if any movement should be made in the direction of placing the banks of the country in the category of department stores. The business is one requiring training, skill, and application, and I think that the profession of banking would suffer if there should be a departure from the principles which should govern and have heretofore governed.
 
 
 45
 'I enclose with this a draft of a proposed amendment to the national-bank act designed to empower national banks located in towns of not over 3,000 population, under such regulations and restrictions as may from time to time be approved and promulgated by the Comptroller of the Currency, to act as agents for the placing of insurance policies. * * *'I respectfully recommend and urge the adoption of such an amendment for the reasons I have given.
 
 
 46
 'I am today writing a letter similar to this to Congressman Glass, chairman of the Banking and Currency Committee of the House of Representatives.' 53 Cong.Rec. 11001 (1916).[5]
 
 
 47
 It thus appears to be clear history the contemporaneous legislative history of Section 92 that Congress agreed with and acquiesced in the then Comptroller's ruling that 'National banks are not given either expressly nor by necessary implication the power to act as agents for insurance companies', and by conferring the limited power which was conferred by the amendment Congress intended to protect insurance agents in cities of over 5,000 population from competition by national banks which would be 'likely to trespass upon outside business naturally belonging to others'.
 
 
 48
 In the briefs filed by counsel there is set forth a complete legislative history with respect to subsequent legislation dealing with national banks, particularly the 1933 Glass-Steagall Banking Act (H.R. 5661, 73rd Cong., 1st Sess., 1933), and the proposed Financial Institutions Act of 1957 (S. 1451, 85th Cong., 1st Sess., 1957), and we are impressed that the Congress has never considered that national banks had insurance agency powers except as limited by Section 92 and Congress has never deemed it appropriate or desirable that such powers be extended beyond the 5,000 population limit, it being our conclusion that Comptroller Saxon's 1963 Ruling No. 7110 is not only contrary to legislative intent as demonstrated contemporaneously with the enactment of Section 92, but it is also contrary to the continuing intent of Congress as demonstrated since that time.
 
 
 49
 Appellants insist, however, that even if the Comptroller's order was unauthorized by the statute and the bank's insurance activity therefore illegal, the plaintiffs below had no standing to bring these actions. In urging this view Appellants rely on a line of decision concerning public power Authorities and Cooperatives, of which Alabama Power Company v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), and Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), are typical.
 
 
 50
 We regard these cases as being clearly distinguishable as they involved federally financed competition by a new competitor who was lawfully authorized to compete with the power companies. That is not the situation in the case before us. Here we have new competition that is in and of itself unlawful because, as we have seen, a national bank cannot legally act as an insurance agent ina city of more than 5,000 population. We find no fault with Appellants' argument that the plaintiffs in the court below, who are licensed professional insurance agents, have no legal right to be free from lawful competition by other licensed agents who are lawfully and properly empowered to engage in the insurance business, but they do have a legal right to be protected from unlawful competition by national banks.
 
 
 51
 In recent years a number of the Comptroller's rulings and the activity purportedly authorized by them have been challenged in the courts, and in each instance the Comptroller has contended that the plaintiffs had no standing to bring the suits, with results as hereafter indicated.
 
 
 52
 For many years the Federal Reserve Board and the office of the Comptroller of the Currency had construed the National Bank Act as prohibiting national banks from underwriting local government securities not backed by the taxing power. In 1963 Comptroller Saxon reversed the position adopted by his predecessors and ruled that Section 24(7) of the Act authorized banks to underwrite such securities even though not backed by the taxing power of a government entity. In Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C., 1966), a group of private underwriters who stood to suffer financial injury as a result of this new underwriting competition by national banks brought suit to declare unlawful Comptroller Saxon's ruling. The Comptroller interposed a 'lack of standing' defense based upon decisions concerning public power cooperatives and urban renewal projects. Dealing with that defense the Court held:
 
 
 53
 'The gravamen of the plaintiffs' claim for relief is that they are being subjected to competition by illegal activities of national banks. While no one may maintain a suit to restrain lawful competition merely because he is suffering an economic detriment, nevertheless, a person has a standing to complain against illegal competition, or specifically, against competition on the part of a person who lacks the legal right or power to pursue the competitive activities.' 261 F.Supp. at 248.
 
 
 54
 The Court held the Comptroller's ruling unlawful.
 
 
 55
 In an even more recent case involving unlawful national bank competition and the Comptroller of the Currency, Investment Company Institute v. Camp, 274 F.Supp. 624 (D.C.C., 1967), a suit was brought by several 'open-end' investment companies (mutual funds) and their national trade association, The Investment Company Institute, to have declared unlawful another ruling issued by Comptroller Saxon in 1963 by which he purported to authorize national banks to establish and operate 'collective investment funds'. Here again the Comptroller raised the issue of standing to sue, claiming that the plaintiffs had no legal right to object to the new national bank competition which was brought about by his ruling. The Court held that the plaintiffs had standing to complain against unlawful competition and that the public power and urban renewal cases relied upon by the Comptroller were not in point. The Court held the Comptroller's ruling unlawful.
 
 
 56
 In both of the cases immediately above cited the plaintiffs predicated their procedural right to judicial review upon the declaratory judgment and injunctive provisions of Section 10 of the Administrative Procedure Act as is done in this case, there being no specific judicial review provision in the National Bank Act.
 
 
 57
 These two district court decisions are in harmony with the decision of the Supreme Court in Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483 (1929), in which it was held that one engaged in a licensed business has standing to sue to enjoin unlawful competition.
 
 
 58
 Without dwelling on the point further, it may be observed that the arguments advanced by Appellants against Appellees' standing to sue appear to be the same arguments that have been rejected in a large number of other 'unlawful competition' cases in which the Comptroller and the national banks have been involved.[6]
 
 
 59
 A review of the cases footnoted shows that in at least four different areas of purported Comptroller action under the National Bank Act the federal courts have rejected the Comptroller's argument that competitors lack standing to challenge his actions, these areas being: (a) unlawful approval of branch banks; (b) unlawful chartering of new national banks; (c) unlawful approval of securities and underwriting; and (d) unlawful approval of 'commingled investment accounts'. In most of the cases footnoted the federal courts have ruled that competitors occupying a position comparable to that of the Appellees here had standing to challenge both the unlawful action by the Comptroller and the unlawful competition by the national banks.
 
 
 60
 Plaintiffs' standing to sue is also supported by the fact that the legislative history of the National Bank Act manifests a Congressional intent to protect insurance agents from an invasion of their insurance agency business by national banks in cities of over 5,000 population. Indeed, we can conceive of no reason why Congress would have limited such activity to communities of less than 5,000 population if it were not for the specific purpose of protecting those in the position of the Appellees in these cases. The limitation was imposed so that national banks in larger cities would not be 'likely to trespass upon outside business naturally belonging to others'. 53 Cong.Rec. 11001 (1916). A strong Congressional concern for the protection of insurance agents against unwarranted competition by national banks is again reflected in the legislative histories of the 1933 and 1957 attempts to overhaul the National Bank Act. In 1933 Congress recognized that national bank competition with insurance agents was 'unfair competition' and that 'it certainly is unfair to the man in the insurance business'. 77 Cong.Rec. 4048. And in 1957 one of the stated purposes for the refusal of Congress to expand the insurance agency power of national banks was the Congressional desire to 'consider the independent insurance businessmen, so that we don't do something that would be harmful to them'.[7]
 
 
 61
 So, in addition to their legal right to protect themselves from unlawful competition, the insurance agents who instituted these actions had a 'statutory aid to standing'. See Hardin v. Kentucky Utilities Company, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).
 
 
 62
 Nothing said here conflicts with this Court's previous pronouncements in the public power cases, of which Rural Electrification Administration v. Central Louisiana Electric Company, 354 F.2d 859 (5 Cir., 1966), is typical. In that case it was said:
 
 
 63
 'Under Section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. 1009, it seems to be settled in a case of this kind that if Congress has failed to give an appellant standing to sue by express or implied provisions of statute * * * mere economic competition made possible by governmental action (even if allegedly illegal) does not give standing to sue to restrain such action.'
 
 
 64
 That case was not a case of this kind and this case is not a case of that kind. The cases here decided involved neither federally sponsored power projects nor federally sponsored urban renewal projects. Neither do they involve the spending of federal funds or lawful competition. Instead, these cases involve unlawful competition by a national bank from which the power to compete has been withheld by Congress. Moreover, the plaintiffs in these cases had a 'statutory aid to standing'.
 
 
 65
 Viewing the matter as we do, we agree that consideration of secondary factual issues was unnecessary and the grant of summary judgment was proper.
 
 
 66
 Affirmed.
 
 On Petition for Rehearing En Banc
 
 67
 Before GEWIN and THORNBERRY, Circuit Judges, and ELLIOTT, District Judge.
 
 PER CURIAM:
 
 68
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Ruld 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 69
 THORNBERRY, Circuit Judge (concurring specially):
 
 
 70
 Inasmuch as I agree with the majority that the insurance agents have standing to sue, it is with some reluctance that I venture my own thoughts on what the Supreme Court has called 'a complicated specialty of federal jurisdiction.' See United States ex rel. Chapman v. Federal Power Commission, 1953, 345 U.S. 153, 156. 73 S.Ct. 609, 612, 97 L.Ed. 918. Nevertheless, I feel that I should do so because I am not persuaded that appellees have a statutory aid to standing and am troubled by Alabama Power Co. v. Ickes, supra, and Tennessee Electric Power Co. v. Tennessee Valley Authority, supra, two very difficult cases.
 
 
 71
 If it were clear that one of the purposes of section 92 was to protect insurance agents in cities of greater than 5,000 population from competition with national banks, there would be no question of standing in this case. See, e.g., Hardin v. Kentucky Utilities Co., 1968, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787; Federal Communications Commission v. Sanders, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869.[1] But in evaluating the legislative history of section 92, I find little evidence of an intent to protect insurance agents from competition. The statute was designed to strengthen banks in smaller towns where they needed strengthening, but I do not see an equal concern for protecting insurance agents in larger towns. Though congressional concern for protecting insurance agents from competition with national banks was apparent in the attempts to overhaul the National Bank Act in 1933 and again in 1957, this evidence sheds no light on the legislative purpose underlying section 92, enacted in 1916.
 
 
 72
 I understand the majority to say that cases like Alabama Power, Tennessee Electric, and Rural Electrification Administration v. Central Louisiana Electric Co., 5th Cir. 1966, 354 F.2d 859 involved federally financed competition by a new competitor lawfully authorized to compete with the power companies whereas the insurance agents here are challenging new competition that is in itself unlawful. This same distinction was perceived by Judge Holtzoff in Baker, Watts & Co. v. Saxon, supra:
 
 
 73
 The line of cases on which the Government relies and that are well represented by Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and other similar decisions, are distinguishable. Their progenitor is a doctrine enunciated in Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078, to the effect that a person may not maintain a suit to enjoin the use of Government funds, even if such use is claimed to be in violation of law. The fact that the plaintiff is suffering an economic detriment from competition assisted by a loan or grant of Government funds, does not give him a standing to sue. This doctrine is entirely different from the principle that permits one to bring an action to enjoin an illegal activity on the part of a competitor, or to restrain the illegal authorization by the Government of an unlawful competitive undertaking.
 
 
 74
 261 F.Supp. at 249. Baker, Watts & Co. is more closely in point than the so-called branch-banking cases (see footnote 6 of the majority opinion) because there a non-bank party was given standing to challenge the legality of competition that had been undertaken by national banks with the authorization of the Comptroller. As I see it, the critical point is that the rule of no-standing invoked by the Supreme Court in Tennessee Electric and Alabama Power rests on the philosophy of Frothingham v. Mellon, 1923, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 that not just anyone should have standing to assert the invalidity of a federal program.[2] To the rule for taxpayer-suits announced in Frothingham, the later cases add that there is a lack of standing even where a plaintiff alleges that as a result of an unlawful federal program he is suffering economic injury from increased, though lawful, competition. The distinguishing factor in the instant case, as in Baker, Watts & Co., is that plaintiffs-appellees allege that as a result of the Comptroller's ruling they are suffering economic injury from unlawful competition with a national bank. Setting the administrative decision to one side, the essence of this case is an allegation by insurance agents that a national bank is selling insurance in violation of the National Bank Act. More is involved than the bare allegation that a certain federal program or federal administrative decision is unconstitutional or in violation of statute. Since more is involved, Alabama Power and Tennessee Electric are not controlling.[3]
 
 
 75
 I would be the first to concede that the distinction drawn between Alabama Power and the instant case is a fine one and not altogether satisfactory, but I believe it to be valid. Any rule of no-standing, whether it be the one enunciated in Frothingham, Alabama Power, or some other case, must stem from the conclusion that the particular plaintiff does not present a dispute in a concrete adversary context and in a form historically viewed as susceptible of judicial resolution. As stated in Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 1952-1953.
 
 
 76
 The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in standing problems is on whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy,' Baker v. Carr, supra, 369 U.S. at 204, 82 S.Ct. at 703, 7 L.Ed.2d 663, and whether the dispute touches upon 'the legal relations of parties having adverse legal interests.' Aetna Life Insurance Co. (of Hartford, Conn.) v. Haworth, supra, 300 U.S. (240) at 241, 57 S.Ct. (461) at 464 (81 L.Ed. 617). In Alabama Power and Tennessee Electric, the Court must have been persuaded that the power companies were not bringing a conventional legal action but were merely attempting to air generalized grievances about the conduct of government or the allocation of power in the federal system. Flast confirms that a plaintiff in this posture has no standing to sue. 88 S.Ct. at 1956.[4]
 
 
 77
 In the instant case, on the other hand, the insurance agents are face to face in the business world with formidable but allegedly illegal competitors. It is inarguable that they have a sufficient personal stake in the outcome of the controversy to assure concrete adverseness.
 
 
 78
 As for the merits of the case, I have little to add to what the majority have said. From an economic standpoint, it may be unfortunate that this Court is interfering with the expansion of national banks into the area of credit-related insurance, but the banks should look to Congress, not the Comptroller.
 
 
 
 [1]
 Decided separately by the District Court, but by joint motion consolidated for purpose of appeal
 
 
 [2]
 Mr. Saxon, who was the author of Ruling No. 7110 complained of, was succeeded by William B. Camp while this litigation was pending and Mr. Camp was automatically substituted as the defendant
 
 
 [3]
 Report of the Advisory Committee for the Study of Federal Statutes Governing Financial Institutions and Credit to the Senate Committee on Banking and Currency, 84th Cong., 2d Sess., pp. IX and 50 (1956); Hearings Before Subcommittee on Bank Supervision and Insurance of the House Committee on Banking and Currency on H.R. 107 and H.R. 6885, 89th Cong., 1st Sess., p. 293 (1965); and 103 Cong.Rec. 3477 (1957)
 
 
 [4]
 National Banks and the Future-- report of the Advisory Committee on Banking to the Comtroller of the Currency, pp. IV-IX and 58-59 (1962)
 
 
 [5]
 When the Senate acted on the matter a population figure of 5,000 was chosen instead of 3,000
 
 
 [6]
 Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8 Cir. 1966); First National Bank of Smithfield, North Carolina v. First National Bank of Eastern North Carolina, and Saxon, 232 F.Supp. 725 (E.D.N.C.1964), reversed on other grounds, 352 F.2d 267 (4 Cir. 1965); Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), reversed on other grounds, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6 Cir. 1958), cert. denied, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958); Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (D.D.C.1959), affirmed 108 U.S.App.D.C. 37, 278 F.2d 871 (1960); Commercial Security Bank v. Saxon, 236 F.Supp. 457 (D.D.C.1964), affirmed 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); Walker Bank & Trust Co. v. Saxon, 234 F.Supp. 74 (D. Utah 1964), reversed 352 F.2d 90 (10 Cir. 1965), affirmed 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); Investment Company Institute v. Camp, 274 F.Supp. 624 (D.D.C.1967); Leuthold v. Camp, 273 F.Supp. 695 (D.Mont.1967); Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C.1966); Marion National Bank of Marion v. Saxon, 261 F.Supp. 373 (N.D.Ind.1966); Bank of Haw River v. Saxon, 257 F.Supp. 74 (M.D.N.C.1966); Bank of Sussex County v. Saxon, 251 F.Supp. 132 (D.N.J.1966); Citizens Bank of Hattiesburg v. Saxon, No. 1998 (S.D.Miss., Feb. 14, 1966), affirmed on other grounds, 387 F.2d 375 (5 Cir. 1967); Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (M.D.Ga.1965); Hoosier State Bank of Indiana v. Saxon, 248 F.Supp. 233 (N.D.Ind.1965); Farris v. Indian Hills National Bank, 244 F.Supp. 594 (D.Neb.1964); and Suburban Trust Company v. National Bank of Westfield, 211 F.Supp. 694 (D.N.J.1962)
 
 
 [7]
 Hearings Before the House Committee on Banking and Currency on S. 1451 and H.R. 7026, 85th Cong., 1st Sess. (1957), Part I, p. 620
 
 
 [1]
 In FCC v. Sanders, the Supreme Court held that an existing broadcasting station, which would suffer economic injury from competition, had standing to challenge the legality of the Commission's grant of a construction permit for a new station. The basis for standing was much the same as had been unsuccessfully asserted in Alabama Power and Tennessee Electric except that a statute, 47 U.S.C. 402(b)(2), provided for an appeal to the Court of Appeals for the District of Columbia 'by any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application.' There was a broad statutory aid to standing. In the opinion of Professor Davis, the Sanders case means there is a statutory aid to standing in any situation where the Administrative Procedure Act is applicable because section 10(a) of the Act, 5 U.S.C.A. 702, provides for review at the instance of 'a person * * * adversely affected or aggrieved * * * within the meaning of any relevant statute, * * *' 3 Davis, Administrative Law Treatise 22.04 at 221 (1958 ed.). Court decisions, however, seem to reject the view that section 10(a) confers an independent statutory aid to standing. See Rural Electrification Administration v. Central Louisiana Elec. Co., 5th Cir. 1966, 354 F.2d 859, 863; Braude v. Wirtz, 9th Cir. 1965, 350 F.2d 702, 708; Pennsylvania Railroad Co. v. Dillon, 1964, 118 U.S.App.D.C. 257, 335 F.2d 292
 
 
 [2]
 In Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947, the Supreme Court held that a taxpayer has standing to challenge the constitutionality of the expenditure of federal funds to religious schools as authorized by federal statute. While the Court reaffirmed Frothingham v. Mellon and attempted to delimit the area still governed by that case, it said that a person having a mere taxpayer's interest has standing to challenge the validity of a congressional enactment where that enactment allegedly exceeds a specific constitutional limitation on the exercise of the congressional taxing and spending power. The establishment clause of the first amendment was found to be a specific constitutional limitation on the taxing and spending power. At this time, it is difficult for me to assay the full impact of Flast on the law of standing
 
 
 [3]
 It may be that there is little difference between the way the majority have analyzed these cases and the way I analyze them, but I am troubled by the emphasis they place on the unlawfulness of competition in this case as opposed to the lawfulness of competition in Alabama Power and Tennessee Electric. In Alabama Power, the private utilities conceded that municipalities could compete with them but contended that the federal administrator had no constitutional or statutory power to make loans to municipalities. In Tennessee Electric, it was clear that TVA or anyone else could compete with a private utility but the utillity alleged that the statute creating TVA was unconstitutional. In the case at bar, plaintiffs-appellees aim their assertion of illegality at the competitors themselves, i.e., the national banks. It is the allegation that national banks are engaged in the unlawful sale of insurance that gives standing, not the fact that they are. By determining and then emphasizing the unlawfulness of what national banks are doing, the majority imply that standing, which is a jurisdictional matter, may depend on the way in which the merits of the case are decided. This simply cannot be right. Of course the nature of the suit is important in determining whether a party has standing, but his standing does not hinge on a final determination of the merits
 
 
 [4]
 In Alabama Power, Mr. Justice Sutherland said that as a general proposition a third party has no standing to sue a borrower on the ground that he has suffered some indirect economic injury from an illegal arrangement between the borrower and lender. Whether this proposition be sound or not, I believe the Court's fear was that such a suit is not concrete enough, that it does not touch directly enough on the legal relations of two parties having adverse interests. Admittedly, I cannot be certain this was the rationale, for the author of the opinion uses confusing language to the effect that a party to have standing must have suffered the invasion of some legal or equitable right. This type of analysis has been severely criticized, see 3 Davis, Administrative Law Treatise 22.04 (1958 ed.); Wright, Federal Courts 13 at 38 (1963 ed.), and seems to have passed out of vogue. But see Barlow v. Collins, 5th Cir. 1968, 398 F.2d 398 (July 16, 1968)